**Irene COOK, as Administratrix of the Estate of Jerry D. Cook, Plaintiff-Appellant,**

v.

**BRANICK MFG., INC., a Corporation, et al., Defendants-Appellees.**

No. 82–7409.

United States Court of Appeals, Eleventh Circuit.

July 19, 1984.

Stephen D. Heninger, Birmingham, Ala., for plaintiff-appellant.

Larry W. Harper, William T. Mills, II, Birmingham, Ala., for Branick.

W. Michael Atchison, E. Martin Bloom, Birmingham, Ala., for Bandag.

Before KRAVITCH, JOHNSON and HATCHETT, Circuit Judges.

JOHNSON, Circuit Judge:

This is an appeal from a judgment of the United States District Court for the Northern District of Alabama in favor of the defendants, Branick Mfg., Inc., Bandag Equipment Co., Inc., and Bandag, Inc., in a diversity personal injury suit. We affirm the final judgment of the district court.

Bandag, Inc., is the franchisor of a cold tire recapping process, which employs split curing rims. These are tire rims that are split in two parts circumferentially. Tires are fitted onto the bottom half, and the top half is then placed on, twisted, and locked into place. The tire can then be inflated so that various operations in the recapping process may be performed. Two types of rims are used in the Bandag process; both are manufactured by Branick Mfg., Inc. One type is marketed under Branick's name; the other, similar in construction but more lightweight, is marketed as a "Bandag" rim. Bandag has approved both rims for use by its franchisees.

The evidence at trial indicated that in the late 1960's Bandag became concerned about the safety of these rims. There exists the potential, when tire pressure is suddenly reduced (for example, when a tire blows out), for the two halves of the rim to fly apart with extreme force. Bandag requested that Branick design a locking device that would prevent such an occurrence. In 1969 Branick submitted to Bandag a design that contained two eyelet holes, one on each part of the rim, which would align when the two halves were twisted together into the locked position. A safety pin, which was attached to one of the rim halves with a piece of cable, was to be put through the holes securing the two halves together.

Sometime in the mid-1970's Bandag became aware that its franchisees were misusing the safety equipment. Bandag conducts a franchise inspection program, which includes reviews of safety procedures. Bandag discovered that because the safety pins hung freely on their cables and would often get in the way of workers using the rims, workers were routinely cutting the pins off the rims. Once the pins were detached they would become lost, and most workers were apparently no longer using them. Bandag responded to this problem in a number of ways. In 1977 Bandag and Branick officials met and discussed the potential liability for accidents resulting from failure to use the safety pins. Bandag requested that all Bandag rims be retrofitted with warnings notifying workers that using the rims without the pins was dangerous. Warnings were put on Bandag rims, but Branick never retrofit its own rims in this manner. Bandag distributed safety posters emphasizing the importance of the safety pins and requested that the franchisees post them in their work areas. Bandag included similar warnings in its operations manual. Bandag continued to conduct safety inspections and notified franchisees when it discovered that pins were not being used. Finally, Bandag informed Branick that it would no longer approve rims without automatic safety locks, and all Branick rims manufactured after 1980 contain such devices.

Lynn Strickland is a Bandag franchisee in Birmingham, Alabama. Bandag's franchise agreement with Lynn Strickland provides that it may inspect the Lynn Strickland premises to insure that the franchisee is "faithfully performing the terms and conditions of the Agreement, is maintaining its premises adequately and adhering to prescribed standards of physical plan, housekeeping and workmanship in its operations." The agreement also provides that "Franchisee's operations hereunder shall be at its risk and under its control." Less than six weeks before the accident involved in this case, a Bandag representative inspected the Lynn Strickland shop. The inspector discovered that Lynn Strickland's employees were not using safety pins on the curing rims and that the air hoses at the shop did not have pressure regulators so that workers were unable to tell whether they were inflating the tires above the recommended pressure. The inspector orally notified the shop supervisor of these dangerous conditions at the time of the inspection and later sent the supervisor a written notification, which indicated that this was the fourth warning about failure to use the pins.

At the time of his accident, Jerry Cook had been employed at Lynn Strickland for about three months. Cook testified that he had never been told about the use of safety pins and had never seen any such pins in

the Lynn Strickland shop. On September 4, 1980, Cook was mounting a tire onto one of the Branick heavyweight rims to inflate it and check it for leaks. When he inflated the tire, it exploded. The rim split, and the upper half struck him in the head severely injuring him.

On March 25, 1981, Cook and his wife, Irene, filed this diversity suit in the Northern District of Alabama against Branick. 28 U.S.C.A. § 1332. They later amended the complaint to include Bandag Equipment Co., Inc. and Bandag, Inc. The complaint alleged four causes of action against the defendants: 1) negligent design of the rim and its safety pin lock; 2) negligent failure to warn the plaintiff of the proper use and dangers inherent in the use of the rims; 3) negligent conduct of the safety inspections; 4) wantonness. At the close of the evidence the district court directed a verdict in favor of the defendant Bandag on all claims. It also directed a verdict in favor of the defendant Branick on the wantonness claim. The court submitted the negligent design claim against Branick to the jury, which returned a verdict in favor of the defendant. The plaintiff filed a timely notice of appeal attacking the district court's direction of a verdict on the negligence claims against Bandag and on the wantonness claims against Bandag and Branick.[1]

### A. The Negligence Claims

■ The district court directed a verdict on behalf of Bandag on the first of Cook's negligence claims, that Bandag and Branick negligently designed the rim and its safety pin lock, on the grounds that there was not substantial evidence to show that Bandag had any part in the design, manufacture, or sale and distribution of the rim. The standard of review for determining whether there is sufficient evidence to submit a case to the jury in the face of a directed verdict motion is that if, after viewing all the evidence in the light most favorable to the non-moving party, the facts and inferences point so strongly in favor of one party that reasonable persons could not decide against the movant, a directed verdict is appropriate. On the other hand, if there is substantial evidence of such quality and weight that reasonable persons in the exercise of impartial judgment might reach different conclusions, the court should deny the motion. *Boeing Co. v. Shipman*, 411 F.2d 365, 374 (5th Cir. 1969) (en banc).[2] This standard applies equally in diversity cases. *Neff v. Kehoe*, 708 F.2d 639, 641 (11th Cir.1983).

■ The Alabama Supreme Court announced the adoption of an extended manufacturer's liability doctrine in *Casrell v. Altec Industries, Inc.*, 335 So.2d 128 (Ala. 1976). "[T]he gravamen of the action is that the defendant manufactured or designed or sold a defective product which, because of its unreasonably unsafe condition, injured the plaintiff or damaged his property when such product, substantially unaltered, was put to its intended use." *Atkins v. American Motors Corp.*, 335 So.2d 134, 139 (Ala.1976). In adopting the doctrine the Alabama Supreme Court explicitly refrained from imposing a strict liability concept but rather retained the common law tort notion of negligence. *Casrell*, 335 So.2d at 132. The district court determined that the *Casrell* doctrine is inapplicable to Bandag because Bandag did not manufacture, design, or sell the Branick rim that was involved in Cook's accident. The appellant contends that the court interpreted these terms too narrowly and that the evidence created a jury question as to whether the close association between Branick and Bandag brought the latter within the ambit of the extended manufacturer's liability doctrine.

The jury's verdict in favor of Branick on the negligent manufacture claim makes it

---

1. Jerry Cook died after the trial. His wife continues his appeal as administratrix of his estate.

2. In *Bonner v. City of Prichard*, 661 F.2d 1206 (11th Cir.1981) (en banc), the Eleventh Circuit has adopted the case law of the former Fifth Circuit handed down as of September 30, 1981, which is binding unless and until overruled or modified by this Court en banc.

unnecessary for us to address this issue. The district court instructed the jury on two essential elements of negligent manufacture and on one affirmative defense. First, the court instructed that to prevail the plaintiffs must prove that "it is more probably true than not, that this rim when manufactured and sold by Branick was unreasonably dangerous." Second, the court instructed that the plaintiffs must demonstrate that this dangerous condition was the proximate cause of Cook's injury. Finally, the court instructed the jury on the affirmative defense of contributory negligence. There was never any issue as to whether Branick designed, manufactured, or sold the rim—the court instructed the jury that Branick was the manufacturer. The jury's verdict in favor of Branick demonstrates that it must have found that the design and manufacture of the rim were not unreasonably dangerous, or that the design defect was not the proximate cause of the plaintiff's injury, or that Cook was contributorily negligent. Any of these findings would absolve Bandag of liability under the extended manufacturer's warranty claim. Therefore, failure to submit that claim to the jury could not have prejudiced the plaintiffs. Because the plaintiffs suffered no prejudice, any error on the part of the trial court in directing a verdict cannot be the basis for reversal. *Cf. Arcement v. Southern Pacific Transport Co.,* 517 F.2d 729, 732 n. 4 (5th Cir.1975).[3]

■ The appellant further claims that Bandag's position as a franchisor, or its connection with the design and distribution of the product, imposed upon the company the duty to warn Jerry Cook of the danger inherent in use of the rim without a safety pin. A directed verdict on this claim was proper because under Alabama law whenever a third party has a duty to warn of a dangerous condition in the workplace that duty is discharged by informing the employer of the dangerous condition—warning to each of the employer's individual employees who may be threatened by the dangerous condition then becomes the responsibility of the employer.

■ A leading Alabama case on this point is *Crawford Johnson & Co. v. Duffner,* 279 Ala. 678, 189 So.2d 474 (1966). There the plaintiff's father contracted with the defendant to repair a boiler. The plaintiff, who was employed by his father, alleged that he was injured because of his ignorance of a safety switch on the boiler. The evidence tended to show that the father knew about the switch. The Supreme Court held the following instruction proper:

> the defendant was under no duty to make its premises reasonably safe from hazards of which the plaintiff's employer, J.L. Duffner, Sr., was fully aware, and if you are reasonably satisfied from the evidence that plaintiff suffered his injuries and damages as a proximate consequence of such hazard, then your verdict must be for the defendant.

*Id.* at 476. The court stated that

> [a]ny duty on the part of defendant to warn of the [dangerous working condition] would ordinarily be discharged when defendant notified all supervisory personnel of the [plaintiff]. They knew what employees of theirs had assumed such relationships to them that they would be put to work on this job. Defendant and all the world except these supervisory officials were ignorant of this knowledge. To require the defendant to attempt to learn the identity of each and every employee [of the employer], who was and would be involved on this job, would not only be wholly unreasonable, but it would in all probability prove both futile and impossible since the [employer's] supervisory officials ... might shift at any time, or be compelled to shift, the employees assigned to this work.

---

3. An alternative ground exists for holding any error non-prejudicial. Under the *Casrell* doctrine, "[t]he important factor is whether it is safe or dangerous when the product is used as it was intended to be used.... However, danger

may be obviated by an adequate warning." 335 So.2d at 133. We hold that the warning that Bandag gave about the dangers of using the rim without a safety pin was, as a matter of law, adequate.

*Id.* at 477, *quoting Storm v. New York Telephone,* 270 N.Y. 103, 110, 200 N.E. 659, 662. The court concluded that "[i]f plaintiff's employer ... was fully aware of the hazard which proximately caused plaintiff's injury, then it was the duty of plaintiff's employer to warn plaintiff of the hazard." *Id.* at 478; *see also Lowe v. United States,* 611 F.2d 76, 77 (5th Cir.1980) (under Florida law "[t]he duty of the landowner to warn of a dangerous condition is satisfied by notice to the contractor or supervisory personnel"); *Gulf Oil Corp. v. Bivens,* 276 F.2d 753, 758 (5th Cir.1960) (cited with approval in *Duffner* for the proposition that the duty to warn employees of hidden dangers "is discharged if those in charge of the work ... are given warning or have knowledge of the danger") and cases cited therein; *Union Tank & Supply Co. v. Kelley,* 167 F.2d 811, 815 (5th Cir.1948) (after defendant notified plaintiff's employer of dangers "duty was on plaintiff's employer and not on the defendant to warn plaintiff of the dangers of working with steel at night and to furnish him with adequate lighting").

The considerations that led the Alabama Supreme Court to its holding in *Duffner* apply equally where the duty to warn is created by the defendant's status as a franchisor or its connection with the manufacture of a potentially unsafe product. Where a franchisor or distributor learns of a defect in an industrial product that creates a danger to workers, it is impractical to require it to notify each employee of every franchisee. The warning is more effectively disseminated by requiring the franchisor or distributor to communicate the danger to the employer and then requiring the employer, who is in daily contact with the employees and knows which

are likely to be exposed to the danger, to warn the endangered workers. We conclude, therefore, that under Alabama law Bandag discharged any duty it may have had to warn of the unsafe condition of the rims if it adequately notified Lynn Strickland supervisory personnel of the danger.

The evidence at trial showed conclusively that as late as six weeks before the accident Bandag warned Lynn Strickland's supervisors of the very conditions that caused Cook's injury. The evidence further indicated that Bandag had repeatedly warned its franchisees in general and Lynn Strickland in particular about the danger of non-use of the pins. By making such warnings Bandag satisfied its duty to warn and any further responsibility to warn individual employees of the hazard fell on Lynn Strickland.[4]

The appellant also claims that the district court erred in directing a verdict on its negligent inspection claim. Based on the tort doctrine that "[o]ne who undertakes, gratuitously or for consideration, to render services to another ... for the protection of a third person ... is subject to liability to the third person for physical harm resulting from his failure to exercise reasonable care," Restatement (Second) of Torts, § 324A, the Alabama Supreme Court has held that where a party undertakes to conduct safety inspections of an employer's premises, the inspector is required to exercise due care in conducting the inspection. *Beasley v. McDonald Engineering Co.,* 287 Ala. 189, 249 So.2d 844 (1971); *Rudolph v. First Southern Federal Savings and Loan,* 414 So.2d 64, 67 (Ala.1982). The appellant claims that Bandag undertook to inspect the Lynn Strickland workplace, that its inspection was negligent because it failed to notify Cook of the haz-

---

**4.** It is worth pointing out that it is improbable that these warnings would not have filtered down to the individual workers in the shop such as Jerry Cook. The appellant appears to center her case around the failure of Bandag to insist that Branick retrofit a warning about the need to use safety pins on the heavyweight *Branick* rims. The appellant claims that this was the only method by which Bandag could have insured that the warning reached the workers and that if such a warning had been placed on the

Branick rim that injured Jerry Cook, the accident would have been avoided. The *Bandag* rims all carried such warnings. Many of these were in use in the Lynn Strickland shop. Cook testified that although he had frequently used the Bandag rims, he had never noticed the warning or its contents. Moreover, Cook testified that he had seen the operating manual that was kept at the shop. This had explicit instructions on the use of safety pins and regulated air hoses.

ards it found, and that Cook's injury was the proximate result of that negligence. Where a party undertakes a duty to inspect, although it is responsible for reporting unsafe conditions, it is not required to *correct* them.[5] *Hughes v. Hughes,* 367 So.2d 1384, 1387 (Ala.1979). Our question becomes, therefore, whether Bandag discharged its duty when it informed Lynn Strickland of the danger or whether it was required to notify each of the individual employees. Once again, we view the law of Alabama to require only that an inspector notify the employer that a workplace hazard exists. *See id.* at 1387–88 (owner of premises did not negligently inspect when it informed plaintiff's employer, the contractor, of dangers it found, which caused plaintiff's injury).

### B. *The Wantonness Claims*

The plaintiffs' complaint alleged that Bandag and Branick wantonly disregarded their duty to warn employees of the danger posed by use of the rims without safety pins. The district court directed a verdict in favor of both defendants on the wantonness claims. The appellant charges that this was error. Under Alabama law wantonness is the

> conscious doing of some act or omission of some duty under knowledge of existing conditions and conscious that from the doing of such act or omission of such duty injury will likely or probably result. Before a party could be said to be guilty of wanton conduct it must be shown that with reckless indifference to the consequences he consciously and intentionally did some wrongful act or omitted some known duty which produced the injury.

*Schuler v. Nelson Weaver Cos.,* 270 Ala. 727, 121 So.2d 908, 909 (1960). The defendant's state of mind distinguishes wanton-

ness from negligence claims. Negligence requires only that the defendant *should have known* of a dangerous condition whereas "[w]antonness may arise from *knowledge* that persons ... are likely to be in a position of danger." *W.T. Ratliffe Co. v. Purvis,* 292 Ala. 171, 291 So.2d 289, 292 (1974). The Alabama courts have stated that negligence and wantonness are mutually exclusive. *Thompson v. White,* 274 Ala. 413, 149 So.2d 797, 804 (1963). Consequently, although intuition might suggest otherwise, those courts have held that an erroneous directed verdict on the issue of wantonness is not cured by a jury's finding that the defendant was not negligent. *Canida v. U.S. Reduction Co.,* 294 Ala. 193, 314 So.2d 279 (1975).

 As with an action in negligence, a predicate to a finding for the plaintiff on a wantonness claim is that the defendant did some act or *omitted some duty* that caused the injury. We have held above that Bandag properly discharged its duty to warn when it informed Cook's employer of the hazards of using a curing rim without a safety pin. Consequently, Bandag omitted no duty and cannot be liable for either negligence or wantonness.[6] Similarly, Branick cannot be liable for failure to warn because any duty that it had to notify Lynn Strickland of the dangerous rims was sufficiently discharged by Bandag, upon whom Branick relied for inspection and notification. Of course, Branick is under no duty to give Lynn Strickland a redundant warning since there is no duty to warn an employer of a danger of which he is already aware. *Glenn v. U.S. Steel Corp.,* 423 So.2d 152, 154 (Ala.1982); *Duffner,* 279 So.2d at 476.

 The appellant also claims that Branick undertook to place warning labels on all of its rims but that it negligently

---

**5.** Nor was such a requirement imposed by the franchise agreement entered by Bandag and Lynn Strickland, which provided that "Franchisee's operations hereunder shall be at its risk and under its control."

**6.** The appellees claim that under Alabama law failure to warn of a product hazard can never be wanton. They cite language from Alabama Supreme Court opinions describing failure to

notify of *known* dangers as "actionable negligence." *Sterchi Bros. Stores, Inc. v. Castleberry,* 236 Ala. 349, 182 So. 474, 477 (1938); *see also Cazalas v. Johns-Manville Sales Corp.,* 435 So.2d 55, 58 (Ala.1983). This may be an excessively narrow and literal reading of these opinions. Because of the above disposition of the wantonness claims, however, we need not deal with this issue.

failed to carry out this program for the "Branick" heavyweight rims, such as the one that injured Jerry Cook. We agree with the district court that there was no substantial evidence to support the assertion that Branick ever undertook such a project with regard to the Branick rims. In the 1977 meeting between Branick and Bandag officials, which was called for the purpose of discussing the problem of the pins, Branick acceded to Bandag's request that it retrofit *Bandag* rims currently in use with warnings instructing workers on the need to use safety pins. But no evidence suggests that Branick agreed to place warning labels on the rims under its own name.[7] Moreover, the record contains no evidence that Branick ever actually undertook such a retrofitting program. Consequently, there is no evidence that Branick had any self-imposed duty to attach warnings to each of the Branick rims.

For the foregoing reasons, the judgment of the district court is AFFIRMED.

7. The appellant claims that the 1977 meeting involved discussions of retrofitting *all* rims with warnings. The evidence does not support this assertion. A Bandag interoffice memorandum recounting the discussions at the meeting speaks of the "light-weight" rim, which was the Bandag rim. The warning, which the memorandum quoted, stated that the rims should not be inflated over 30 PSI, the maximum for the Bandag rims. The maximum for the Branick rims was much greater. The warning also stated that the rim should be used only in the Bandag system, but the Branick rims were used in other systems. Testimony of participants of the meeting indicated that its subject was limited to the Bandag rim.