**William Paul LAKEMAN, Sr., as Administrator of the Estate of Donald Eugene Lakeman, deceased, Plaintiff–Appellee,**

v.

**OTIS ELEVATOR COMPANY, et al., Defendants,**

**PPG Industries, Inc., Defendant–Appellant.**

No. 90–7464.

United States Court of Appeals, Eleventh Circuit.

May 13, 1991.

Hand, Arendall, Bedsole, Greaves & Johnston, George M. Walker, Edward S. Sledge, III, Mobile, Ala., for defendant-appellant.

Joseph M. Brown, Jr., Andrew T. Citrin, Cunningham, Bounds, Yance, Crowder & Brown, Mobile, Ala., for plaintiff-appellee.

Before ANDERSON and CLARK, Circuit Judges, and TUTTLE, Senior Circuit Judge.

TUTTLE, Senior Circuit Judge:

This is an appeal by the defendant, PPG Industries, Inc. ("PPG"). After a jury finding that PPG had acted with wantonness in connection with the asphyxiation death of Donald Eugene Lakeman ("Donald Lakeman" or "Donald"), the District Court for the Southern District of Alabama entered judgment for the plaintiff-appellee, William Paul Lakeman ("Lakeman"), father of the decedent. PPG moved for a judgment notwithstanding the verdict and a new trial. The district court ultimately denied both motions, and PPG now appeals these decisions.

## I. STATEMENT OF THE CASE

On January 29, 1986, Lakeman filed this action in the Circuit Court for Mobile County, Alabama alleging negligence, wantonness, and a breach of the Alabama Extended Manufacturer's Liability Doctrine ("AEMLD") in connection with the asphyxiation death of his son, Donald Lakeman. The complaint, as amended, ultimately named Otis Elevator Co. ("Otis"), United Technologies, Republic Oil Co. ("Republic"), Axton–Cross Chemical Co. ("Axton–Cross"), the Hubbard–Hall Chemical Co., Liberty Mutual Insurance Co., Gregory Owens, and the appellant, PPG, as defendants.

The state court entered summary judgment in favor of Otis and United Technologies. The remaining defendants removed the case to the United States District Court for the Southern District of Alabama, pursuant to that court's diversity jurisdiction. The district court then entered summary judgment in favor of Gregory Owens and Liberty Mutual Insurance Co.

The plaintiff settled with all remaining defendants, except PPG, and the case proceeded to trial. The jury found for Lakeman and awarded $2,500,000.00 in compensatory and punitive damages. The court reduced this award by $250,000.00, the

amount already received by Lakeman in settlement, and entered the judgment on February 22, 1990.

Special interrogatories indicated that the jury found for Lakeman on all three of his claims—negligence, wantonness, and AEMLD. The jury, however, also found that the decedent, Donald Lakeman, had been contributorily negligent. Under Alabama law, a finding of contributory negligence barred recovery on the negligence and AEMLD grounds. Thus, only the finding of wantonness supported the jury award.

On February 28, 1990, PPG filed a Motion for Judgment Notwithstanding the Verdict or, In the Alternative, for a New Trial. On March 15, 1990, Lakeman filed a "cross-motion" requesting a new trial on the negligence and AEMLD issues in the event the court granted either of PPG's motions. On April 25, 1990, the court entered an order granting a new trial on all issues and denying the motion for a JNOV.

On June 4, 1990, however, the district court reversed itself in part and entered a new order denying PPG's motion for a new trial and reinstating the original jury verdict. The court granted Lakeman's cross-motion for a new trial on the negligence and AEMLD issues in the event the court of appeals reversed the finding of wantonness.

PPG appeals the orders of the district court (1) denying its motion for a judgment notwithstanding the verdict, (2) denying its motion for a new trial, and (3) granting Lakeman's cross-motion for a new trial. Because we affirm the orders of the district court denying PPG's motions for a JNOV and new trial, we find it unnecessary to review the order conditionally granting Lakeman's cross-motion.

## II. STATEMENT OF THE FACTS

The decedent, Donald Lakeman, was a mechanic-in-charge for the Otis Elevator Co. and had worked there for approximately two years prior to his death. On August 8, 1984, Donald's supervisor directed him to clean and paint the elevator pit of the Coastal Training Institute in Mobile, Alabama. To get into the pit, Donald opened the elevator door at the first floor, raised the passenger car halfway to the second floor, locked the car in place, and stepped down into the pit. The pit was 78 inches wide, 99 inches long, and 43 inches deep. With the elevator car raised, it was open on top.

After scooping out the excess oil, Donald began to clean up the remaining oil residue with a towel soaked in Otis Controller Solvent–Cleaner No. 4. Shortly thereafter, he was overcome by the chemical vapors and died of asphyxiation.

Controller Cleaner–Solvent No. 4 had been designed for the cleaning of elevator control panels, and an Otis supervisor testified that he had warned Donald not to use it for cleaning elevator pits. Otis provided Solvent–Cleaner No. 2 for the cleaning of elevator pits. There was testimony, however, that Otis employees frequently used Cleaner No. 4 as an all-purpose grease cleaner because it worked so well.

It was undisputed that the active ingredient in Controller Solvent–Cleaner No. 4 was the narcotic 1,1,1–trichloroethane. Likewise, it was undisputed that the vapors from trichloroethane are deadly and have well-known properties that make the chemical inherently dangerous. First, trichloroethane is extremely volatile, and a very small amount of the liquid chemical can produce lethal concentrations of the vapor in a confined space. Second, although trichloroethane vapors have a distinct smell, people adjust quickly to the odor, and the smell seems to "disappear" shortly after a person is exposed to it. Third, trichloroethane vapors are heavier than air and rapidly displace oxygen in low areas.

The chain of distribution was also undisputed. PPG manufactured trichloroethane in bulk. It sold the chemical to its distributor, Axton–Cross. Axton–Cross sold the chemical to Republic, which repackaged the chemical in one-gallon containers provided by Otis. Republic then sold the repackaged chemical to Otis.

Otis lithographed labels on the cans it supplied to Republic. The label gave the

trade name of the solvent, "Controller Solvent–Cleaner No. 4," a warning, and instructions on how to use the product. The label did not, however, state that the solvent contained trichloroethane. The warning read as follows:

### WARNING: VAPOR HARMFUL

USE WITH ADEQUATE VENTILATION.

AVOID PROLONGED OR REPEATED BREATHING OF VAPOR.

AVOID PROLONGED OR REPEATED CONTACT WITH SKIN.

DO NOT TAKE INTERNALLY.

THIS SOLVENT CAN BE USED WITHOUT HARM PROVIDED PRECAUTIONS ARE OBSERVED.

ADEQUATE RESPIRATORY PROTECTION MUST BE PROVIDED IN THE EVENT OF SPILLAGE IN CLOSED SPACES.

DO NOT CONTAMINATE WITH WATER.

INHALATION: MOVE TO FRESH AIR

SKIN: APPLY FIRST AID CREAM

EYES: FLUSH WITH COOL WATER FOR 10–15 MINUTES GO TO HOSPITAL EMERGENCY ROOM

INGESTION: DO NOT INDUCE VOMITING GO TO HOSPITAL EMERGENCY ROOM

The instructions on the opposite side of the can provided:

### NON FLAMMABLE

#### CONTAINS NO CARBONTETRACHLORIDE

LOOSENS OXIDIZED OIL

LOOSENS DIRT AND LINT

BEFORE USING—SHUT DOWN EQUIPMENT

REMOVE OVERLOAD RELAY POTS

VACUUM EQUIPMENT

APPLY WITH PRESSURE TYPE SPRAYER WITH JET NOZZLE

CLEAN EQUIPMENT FROM TOP TO BOTTOM, ONE SWITCH ROW AT A TIME

FLUSH EQUIPMENT THOROUGHLY, USING 2 TO 4 GALLONS PER CONTROLLER

At trial, there was testimony indicating that PPG had actual knowledge of the content of the labels and had evaluated their adequacy. In response to a request by Richard Brown of Axton–Cross, Brent Burelson of PPG conducted a safety seminar at Republic on March 30, 1984. In August of 1984, Burelson wrote to Brown:

"The presentation was given at your request to review the handling and *labeling* procedures employed by Republic Oil.... After the completion of the meeting, I felt that Republic Oil management fully understood the Material Safety Data Sheet and problems associated with handling and *labeling* of the material.... Review of their operation, in my opinion, is consistent with PPG guidelines for filling and handling material on the Republic Oil site."

(emphasis added).

Further, there was evidence at trial that Mr. Burelson of PPG had received photocopies of the warnings and instructions on Cleaner–Solvent No. 4 as early as July 6, 1984. Richard Brown testified that he sent the labels to Mr. Burelson and had asked him to review them. Apparently, PPG had reviewed and approved labels for other chemical distributors. Mr. Burelson, however, never responded.

There was also evidence at trial that the label on the Cleaner–Solvent No. 4 cans was inadequate. The label, for example, did not explain what "adequate ventilation" meant. Trichloroethane vapors are heavier than air and tend to settle near the floor. Thus, a pit that is open to the fresh air on top does not have "adequate ventilation" at the floor.

Further, the label failed to warn that the trichloroethane vapors could be fatal. It warned that the vapor was "harmful" but never stated that it could be lethal. And the statement that "this solvent can be used without harm provided precautions are observed" lulled the user into a false sense of security.

Finally, the label merely cautioned: "avoid prolonged or repeated breathing of vapor." According to expert testimony at trial, however, even short-term or intermittent breathing of vapors could lead to dizziness and lack of muscle coordination. This, in turn, could cause a person to collapse into vapors that had collected near the floor and lead to death.

There was also uncontradicted evidence at trial that PPG provided both Republic and Otis with all of the available safety literature available on trichloroethane. The product bulletins and product information pamphlets clearly explained all of the dangers involved in the use of the product. The literature also explained the proper use and effective labeling of the product.

## III. DISCUSSION

PPG raises several issues on appeal: (1) whether PPG had a duty to Donald Lakeman to warn him of the dangers of trichloroethane; (2) whether the appellee presented sufficient evidence to find that PPG had acted with wantonness in failing to object to the labeling of Controller Cleaner–Solvent No. 4; (3) whether the appellee presented sufficient evidence to find that improper labeling proximately caused Donald Lakeman's death; and (4) whether the district court erred in admitting testimony by experts who were not properly identified prior to trial.

### A. Duty

■ Both of the parties agree that a product manufacturer has a duty to warn ultimate users of the dangers of a product. PPG, however, argues that it falls into an exception to this general rule established in *Purvis v. PPG Industries, Inc.*, 502 So.2d 714 (Ala.1987). There the Alabama Supreme Court recognized that "bulk sales, repackaging or product combinations" may prevent some manufacturers from effectively conveying product information and warnings to the ultimate consumer of a product. Thus, when a manufacturer has a "reasonable basis to believe that the distributor will pass along the product information or warnings," it cannot be held liable if downstream distributors fail to convey these warnings. *Purvis*, 502 So.2d at 722. PPG claims that as a bulk manufacturer of trichloroethane, it is entitled to the legal protection afforded by *Purvis.*

We disagree. *Purvis* does not provide blanket protection for manufacturers simply because they produce a product in bulk; it offers protection only to those manufacturers which have "a reasonable basis to believe that the distributor will pass along the product information or warnings." If a manufacturer knows or should know that downstream distributors are not giving adequate warnings to the end user of a product, then the bulk manufacturer may be held liable for failing to take appropriate action.

In this case there was clearly sufficient evidence to find that PPG did not have a reasonable basis to believe that its distributors were passing along product warnings. There was evidence at trial that Brent Burelson of PPG had evaluated the Otis labels at the safety seminar for Republic, and there was evidence that Burelson had received photocopies of the labels prior to the accident. Since these labels clearly did not contain some of the most important warnings about trichloroethane, a jury certainly could have found that PPG had no basis for believing that Republic was passing along product warnings. Thus, *Purvis* does not apply.

■ PPG further argues that it has discharged any duty to warn that it may have had. In both *Cook v. Branick Mfg., Inc.*, 736 F.2d 1442 (11th Cir.1984) and *Deviner v. Electrolux Motor, AB*, 844 F.2d 769 (11th Cir.1988) this court held that under Alabama law the manufacturer of a product discharges its duty to warn if it gives an adequate warning to the employer of the ultimate user. In this case, there is no question that PPG gave Otis all of the product information on trichloroethane. Thus, PPG concludes, it discharged any legal duty it had to warn Donald Lakeman of the hazards of using its product.

We believe that this case presents a situation very different from that in *Cook* and

*Deviner.* Neither *Cook* nor *Deviner* involved a situation in which the manufacturer voluntarily undertook a responsibility to warn the ultimate user of the product. In this case, however, there is sufficient evidence in the record to support a finding that PPG volunteered to review the warnings that Otis was giving to its employees on the one-gallon cans of trichloroethane. There was testimony, for example, that Brent Burelson of PPG agreed to review the labels. There was evidence that Burelson had copies of the labels. And a letter from Burelson himself admitted that he had reviewed the labeling procedures at Republic.

It is well established under Alabama law that one who volunteers to warn another of a dangerous condition is under a duty to use due care in giving that warning even though the volunteer may have had no preexisting duty to act. *Berkel & Co. Contractors v. Providence Hosp.* 454 So.2d 496, 503 (Ala.1984) ("... a party 'who volunteers to act, though under no duty to do so, is ... charged with the duty of acting with due care.' "); *Parker v. Thyssen Mining Const., Inc.* 428 So.2d 615, 618 (Ala. 1983); *United States Fidelity & Guaranty Co. v. Jones,* 356 So.2d 596, 598 (Ala.1977). PPG, then, was under a duty to review the Otis labels.

### B. Wantonness

■ The Supreme Court of Alabama explained the essential features of a cause of action for wantonness in *Lynn Strickland Sales & Service, Inc. v. Aero–Lane Fabricators, Inc.,* 510 So.2d 142, 145 (Ala.1987) (quoting *Smith v. Roland,* 243 Ala. 400, 403, 10 So.2d 367, 369 (1942)):

Before one can be convicted of wantonness, the facts must show that he was conscious of his conduct and conscious from his knowledge of existing conditions that injury would likely or probably result from his conduct, [and] that with reckless indifference to consequences, he consciously and intentionally did some wrongful act or omitted some known duty which produced the injury.

While there was no direct evidence of Brent Burelson's knowledge (or that of anyone else at PPG), there was clearly sufficient evidence from which a jury could rationally infer that Burelson knew of the dangers of failing to object to the Otis labels and yet knowingly failed to object. As an account manager for PPG, Burelson was well acquainted with the dangers of trichloroethane. He had read all of the product safety literature on the chemical and had conducted several safety seminars on the proper use and handling of trichloroethane. He was aware that the vapors from trichloroethane could be deadly and knew that they tended to settle in low areas.

Further, there was evidence from which the jury could have inferred that Burelson knew that the labels on the Otis cans were inadequate and that injury was likely to result. While Controller Cleaner–Solvent No. 4 was intended for use on elevator control panels, the instructions for use do not make that clear and, in fact, imply that the product can be used as an all purpose cleaner for oil and grease. The label on the container certainly did not warn the user of trichloroethane's most dangerous properties, nor did it warn that the chemical could be lethal. A jury certainly could have rationally inferred that Burelson was aware of the danger posed by such a situation yet consciously disregarded it.

While one can only speculate as to Burelson's possible motives for recklessly disregarding the safety of Otis employees, Lakeman advanced the theory that Burelson and PPG feared that a strong warning label would hurt trichloroethane sales.[1]

---

1. PPG contends that Lakeman engaged in improper argument during his closing statement to the jury. There, Lakeman restated earlier testimony that PPG earned a profit of 40 cents per pound on sales of trichloroethane and used that figure to suggest that PPG was earning a annual profit of $84 million on trichloroethane sales.

Lakeman told the jury to use that figure when calculating punitive damages. PPG argues that allusions to a defendant's financial status are prohibited under Alabama law and that Lakeman's remarks prejudiced its right to a fair trial.

PPG, however, failed to object to Lakeman's statements when they were made. In this cir-

Burelson testified at trial that his promotions and salary increases were based directly on his success in selling trichloroethane. And there was testimony from Otis employees that they would not have used the product had the label warned that it could be deadly.

■ Despite PPG's arguments to the contrary, it is irrelevant that no one had been injured using Cleaner–Solvent No. 4 prior to this accident. While the Alabama Supreme Court has held that knowledge of prior accidents is sufficient to support a finding of wantonness, *see Brown v. Turner*, 497 So.2d 1119 (Ala.1986), we are unaware of any decision in which it has held that knowledge of a prior accident is required. In short, knowledge of a prior accident is some evidence that the defendant consciously disregarded a known danger, but such knowledge may be demonstrated by other evidence as well. In this case, we find that Lakeman presented sufficient other evidence to support a finding of wantonness.

Thus, we hold that the district court did not err in submitting the wantonness issue to the jury.

### C. Proximate Cause

■ PPG further argues that Lakeman presented no evidence that its failure to insist on different labels proximately caused the accident. PPG correctly asserts that under Alabama law, "[a] negligent-failure-to-adequately-warn case cannot be submitted to a jury unless there is some evidence that the allegedly inadequate warning would have been read and heeded and would have kept the accident from occurring." *Gurley v. American Honda Motor Co.*, 505 So.2d 358, 361 (Ala.1987) (citing *E.R. Squibb & Sons, Inc. v. Cox*, 477 So.2d 963 (Ala.1985)). PPG, however, is mistaken in contending that Lakeman presented no evidence that the warning would have been read and heeded.

At trial, Lakeman presented testimony that the decedent was a careful and safety conscious employee, and the appellee, who also worked for Otis, testified that his son was sometimes "too careful." From this, the jury could have easily concluded that Donald Lakeman would have read and heeded an adequate warning label.

Despite PPG's arguments to the contrary, the fact that the decedent used the product for a purpose other than that which was intended does not conclusively show that he failed to read the warning label. First, the instructions did not make it clear that Controller Solvent–Cleaner No. 4 was strictly for use on elevator control panels; they indicated generally that the chemical "dissolves oxidized oil [and] loosens dirt and lint." Thus, it is possible that Donald Lakeman read the instructions yet reasonably believed that the solvent could safely be used to clean oil from the floor of an elevator pit. Second, even if Donald failed to read the instructions, he may have read the warning label which was on the opposite side of the can. There was nothing on the warning label to indicate that the chemical might be fatal if used other than on a control panel.

We also believe that PPG overemphasizes testimony that the decedent ignored an oral warning from his supervisor not to use Cleaner–Solvent No. 4 in elevator pits. Lakeman challenged the credibility of the supervisor, and the jury was free to disregard the evidence. Further, the jury could have concluded that Donald Lakeman simply forgot the oral warning that had been given several weeks before his fatal accident.

### D. Expert Witnesses

■ PPG further objects that it was unfairly prejudiced when experts Dr. Leroy Riddick and Dr. Matthew Barnhill testified on matters outside their identified areas of expertise. In pretrial documents, Lakeman identified Dr. Riddick as an expert qualified by reason of his "extensive experience

cuit the law is clear that a party must make a timely objection at trial to preserve an allegation of improper argument for appeal. *Dempsey v. Mac Towing, Inc.*, 876 F.2d 1538, 1540, n.

1 (11th Cir.1989). Since PPG failed to bring this objection to the attention of the district court in a timely manner, it may not raise the issue for the first time on appeal.

with respect to asphyxia caused by chemicals and other phenomena." He identified Dr. Barnhill as a forensic toxicologist who "will or may be called upon to render testimony with respect to the cause and mechanism of death in this case." At trial, however, Drs. Riddick and Barnhill opined not only on the dangerous properties of trichloroethane and the cause of Donald Lakeman's death, but also on the on the adequacy of the Otis labels. PPG objected to this testimony and moved for a mistrial. The district court denied the motion, finding that PPG had suffered no prejudice.

While the parties have not directed us to any decision in the Eleventh Circuit squarely addressing this issue, it is well established that "the admission of expert testimony is a matter left to the discretion of the district court...." *Wilmington v. J.I. Case Co.*, 793 F.2d 909, 919 (8th Cir.1986). *See also* 4 J. Moore, J. Lucas & G. Grotheer, Jr., Moore's Federal Practice ¶ 26.66[3] (2d ed. 1989 & Supp.1990–91). The court of appeals will not overturn such a decision unless it is manifestly erroneous.

We find that the district court did not abuse its discretion in admitting the testimony of Drs. Riddick and Barnhill. As the district court judge observed, PPG's counsel was well versed in the labeling of toxic chemicals and was capable of cross-examining both doctors effectively. In fact, PPG's cross-examination was quite damaging.

While was agree with PPG that Lakeman violated Rule 26(b)(4)(A) in failing to identify the substance of the opinions to which his witnesses were expected to testify, PPG suffered no prejudice. Thus, we hold that under the circumstances the district court did not err in refusing to grant PPG's motion for a mistrial.

## IV. CONCLUSION

For the foregoing reasons, we AFFIRM the orders of the district court denying PPG's motions for a judgment notwithstanding the verdict and new trial.