Phyllis Dean Scott filed a negligence action against Otis Elevator of Gadsden, Inc., McCalley and Associates, the Peelle Company, and other defendants who are not involved in this appeal. Ms. Scott alleged that she was injured during the course of her employment at Baptist Memorial Hospital of Gadsden when she became pinned between a door and a hospital dumbwaiter cart that had suddenly emerged from an automatic unloading dumbwaiter system. The Peelle Company manufactured and sold the automatic unloading dumbwaiter system; McCalley designed and constructed the Baptist Hospital building; and Otis installed the automatic unloading dumbwaiter system.
Ms. Scott entered into a pro tanto settlement with McCalley, and the Peelle Company, but not with Otis. McCalley and the Peelle Company were dismissed. At trial, Otis moved for a directed verdict at the close of the plaintiff's evidence and at the close of all the evidence. The motions were denied. The trial judge submitted the following interrogatories to the jury for use during its deliberations:
 "Was [Otis] guilty of negligent installation of the dumbwaiter system?
 "Was [Otis] guilty of negligent maintenance of the dumbwaiter system?
 "Was [Otis] guilty of negligent inspection of the dumbwaiter system?"
The jury answered the first question in the negative and the second and third questions in the affirmative. Based on its answers, the jury found for Ms. Scott and awarded her $100,000. The trial court entered a judgment for Ms. Scott in that amount. Otis filed a motion for judgment notwithstanding the verdict, which the trial court denied. Otis argues on appeal that the trial court erred in entering a judgment on the portion of the jury verdict in which Otis was found to have negligently maintained and inspected the automatic "cartveyor" system. Ms. Scott does not appeal.
The Baptist Memorial Hospital was equipped with two automatic cartveyor systems serving three levels. One system conveyed clean supplies from the central *Page 202 
supply area of the hospital, and the other conveyed dirty supplies to the central supply area. Each cartroom for each level could hold two carts. The doors to the cartrooms opened in to the cartrooms. There was no mechanism to indicate to one sending a cart to a different level of the hospital how many carts occupied the receiving cartroom on that level. It is undisputed by the parties that, for this reason, the cartveyor system created a hazard.
Ms. Scott used the cartveyor system during the course of her employment at the hospital. On the day of her injury, Ms. Scott ordered that two carts be sent to her level, one for the clean cartroom and one for the dirty cartroom. One cart already occupied the clean cartroom. Inadvertently, both carts were sent to the clean cartroom. At that time, Ms. Scott was standing in the doorway to the clean cartroom. The third cart entered the room on the cartveyor system, pushing the other two carts toward the door by which Ms. Scott was standing. Ms. Scott became pinned between the door, which opened in to the cartroom, and the carts. As a result, Ms. Scott sustained an injury to her arm.
On appeal, Otis argues that, as the inspector and maintainer of the cartveyor system, it owed no duty to Ms. Scott to correct design defects in the cartveyor system. It argues that the scope of its duty to third persons who might use the cartveyor system was defined by its contract with the hospital, and that the contract stated only that Otis would keep the cartveyor system in working order, not that it would correct design defects. In any event, Otis argues, it discharged any duty it had to third persons who might use the cartveyor system by informing the hospital of the potential hazard.
Ms. Scott contends that installation of an electric eye beam in the cartveyor system would have prevented a cart from being sent to a particular level if the cartroom for that level already had two carts in it. She does not argue that Otis had a duty to actually install an electric eye beam in the cartveyor system, but that it owed a duty to third persons to specifically recommend to the hospital that, as owner of the cartveyor system, it should install an electric eye beam in the cartrooms to prevent too many carts from being sent to a particular room.
After Otis installed the cartveyor systems, it provided three months of follow-up service. Thereafter, Otis entered into a maintenance and inspection contract with the hospital.[1] The contract states in pertinent part:
 "We will regularly and systematically examine, adjust, lubricate as required, and if conditions warrant, repair or replace [certain parts].
"We also agree:
 "To examine periodically all safety devices and governors and conduct our customary annual no load test, and each fifth year perform a full load, full speed test of safety mechanism, overhead speed governors, car and counterweight buffers.
 "We shall not be required to make other safety tests nor to install new attachments on the elevators whether or not recommended or directed by insurance companies or by governmental authorities, nor to make any replacements with parts of a different design.
 "The material handling equipment provided as a part of this installation was designed and manufactured by others. We therefore agree to maintain that portion of the installation in accordance with the terms and conditions of this contract as long as replacement parts are available from the manufacturer.
 "It shall be your responsibility to guard and protect the openings during and after loading and unloading operations and to restrict access to the area of the loading, unloading and transfer operations to trained personnel under your supervision. Adequate warning signs *Page 203 
shall be posted and maintained by you for the protection of employees and public."
It is not disputed that Otis informed the hospital that the cartveyor system, as it was installed, created a potential hazard that could result in accidents such as the one that injured Ms. Scott. Jimmy Hamilton, the adjuster for Otis, testified that, at the time the hospital was being constructed, he recognized the danger inherent in the cartveyor system as it was designed. He stated that he suggested to John Scott, the hospital's construction coordinator, that the doors to the cartroom be redesigned to open outward and that a panic bar be installed on the door to the elevator room so that, if too many carts were sent to the cartroom, the nearest cart would contact the panic bar and open the cartroom door outward. Hamilton also testified that, at the time the hospital was being built, he recommended that an electric eye beam be installed in the cartveyor system. Willis Elrod, an Otis employee, testified that he was present during the conversation between Hamilton and Scott, and that he remembered Hamilton recommending that an electric eye beam be installed in the cartveyor system. However, later at trial, Hamilton was recalled as a witness and, at that time, stated that he did not recall making such a suggestion to Scott.
After the cartveyor system was installed and the hospital began operating, the cartrooms often became "jammed" with too many carts. On many occasions between 1979 and 1981, Willis Elrod was called to correct the problem. He said that he discussed the problem with Danny Holderfield, the hospital's chief engineer, and that, at that time, he suggested that the cartroom doors be redesigned so that they would not swing in to the cartroom. At some point thereafter and before Ms. Scott's accident, Jimmy Hamilton discussed the "jamming" problem with Danny Holderfield. Hamilton told Holderfield that, if the hospital did not implement any of Otis's remedial suggestions, Otis would require the hospital to pay for future visits to "unjam" the cartrooms. The hospital did not implement any of Otis's remedial suggestions.
This action was pending on June 11, 1987; therefore, the applicable standard of review is the "scintilla evidence rule." See Ala. Code 1975, § 12-21-12; Grider v. Grider, 555 So.2d 104
(Ala. 1989).
A motion for judgment notwithstanding the verdict tests the sufficiency of the evidence in the same manner as a motion for a directed verdict at the close of all the evidence. Rule 50, A.R.Civ.P., Committee Comments. King Mines Resort, Inc. v.Malachi Mining Minerals, Inc., 518 So.2d 714 (Ala. 1987). In order to direct a verdict under the scintilla rule of evidence, a trial court must conclude that there is no evidence that, if believed, would support a verdict in favor of the party against whom the directed verdict is sought. King Mines Resort, Inc., supra, citing Herston v. Whitesell, 374 So.2d 267, 270
(Ala. 1979). Because the criteria for testing motions for directed verdict and for J.N.O.V. provide an objective standard, a trial court's ruling on these motions is not discretionary; thus, if alleged error is properly preserved and presented on appeal, review of these rulings is de novo. KingMines Resort, Inc., supra.
Otis argues that, under the provisions of the contract between the parties, it discharged its duty by informing the hospital that the cartveyor system, as installed, presented a potentially hazardous instrumentality. Ms. Scott does not argue that the cartveyor system, as maintained in the condition that existed at the time of her accident, was negligently maintained; that is, she does not argue that Otis failed to keep the cartveyor system in proper working order. She argues only that Otis's inspection of the cartveyor system was negligent in that, she says, it did not specifically recommend that the hospital arrange to have an electric eye beam installed in the cartrooms. Because she does not argue that Otis did not properly maintain the cartveyor system, we hold that the trial court erred in denying Otis's J.N.O.V. motion on the issue of negligent maintenance of the cartveyor system. Thus, the remaining *Page 204 
issue is the propriety vel non of the trial court's denial of Otis's J.N.O.V. motion on the issue of negligent inspection.
As to that issue, Otis argues that, although there are no cases in Alabama stating the duty owed to third parties by one who inspects elevator systems, its duty in this case is analogous to the duty owed by insurers who inspect an insured's premises for potential hazards to the insured's employees and that Alabama courts have defined such an insurer's duty to third parties.[2] Otis cites Hughes v. Hughes, 367 So.2d 1384
(Ala. 1979), which states the duty owed by an insurer that voluntarily undertakes to inspect the premises of its insured. In that case, the plaintiff was injured when, as he was working on a scaffold, he slipped on debris scattered about the workplace. He sued both his employer and his employer's insurance carrier. He alleged that his employer's insurer had negligently inspected the premises. The trial court directed a verdict for the insurer. We stated that the plaintiff must prove that the insurer (1) had undertaken to inspect the worksite, (2) had performed such inspection negligently, and (3) that such negligence was the proximate cause of his injuries. We stated that the duty undertaken by the insurer was to inspect and report hazardous conditions, and that it had no duty to correct safety hazards that it discovered. Having determined that the insurer discovered and reported to its insured the very hazard that caused the plaintiff's injury, we affirmed the judgment of the trial court based on the plaintiff's failure to present a scintilla of evidence tending to prove that the insurer had negligently inspected the premises.
Otis also cites Cook v. Branick Mfg., Inc., 736 F.2d 1442
(11th Cir. 1984), in which the Court of Appeals for the Eleventh Circuit applied Alabama law to the question whether a franchisor had discharged its duty to its franchisee's employee to adequately inspect the workplace for potential hazards. In that case, the franchisor, Bandag, Inc., furnished its franchisee, Lynn Strickland, with split curing rims, instruments used to recap tires. The split curing rims were constructed in two interlocking parts, and, potentially, the two halves of the rim could fly apart with extreme force.
The franchise agreement between Bandag and Lynn Strickland provided that Bandag could inspect the Lynn Strickland premises to ensure that the franchisee was "maintaining its premises adequately," and that Lynn Strickland's "operations hereunder shall be at its risk and under its control." A Bandag representative inspected the Lynn Strickland premises and discovered that its employees were misusing the safety pins on the curing rims; for convenience, workers were frequently removing the safety pins from the rims. The inspector orally informed the shop supervisor of the dangerous condition and later sent the supervisor a written notification. Six weeks later, the plaintiff, a Lynn Strickland employee, was severely injured when a tire rim split.
The plaintiff and his wife sued Bandag, alleging negligent inspection of the Lynn Strickland premises. The trial court directed a verdict for Bandag. The Court of Appeals, citingHughes v. Hughes, supra, stated that under Alabama law a party undertaking a duty to inspect is responsible for reporting unsafe conditions, but that it is not required to correct them. It concluded that the franchise agreement imposed no such requirement. That court held that, by notifying Lynn Strickland of the hazard, Bandag had fulfilled its duty to inspect the Lynn Strickland premises.
Otis also cites decisions in which courts from other jurisdictions have defined the duty to third persons of one who contracts to inspect and maintain elevator systems. It citesHunt v. Jefferson Arms Apartment Co., 679 S.W.2d 875
(Mo.App. 1984), in which an elevator company had contracted with the owner of an apartment building to maintain elevators in good working condition *Page 205 
and to inspect them on a monthly basis. In that case, an elevator was improperly operated by the elevator owner's employees and the plaintiff was injured as a result. The plaintiff sued the elevator maintenance and inspection company, alleging failure to warn the owner of the elevator of the dangerous condition, i.e., the improper operation. The trial court directed a verdict for the elevator maintenance company.
In defining the duty of the elevator company, theHunt court cited a decision from the Missouri Supreme Court inWolfmeyer v. Otis Elevator Co., 262 S.W.2d 18 (Mo. 1953). InWolfmeyer, the plaintiff was injured in an elevator and sued the elevator maintenance company, alleging failure to install a safety device. The trial court directed a verdict for the elevator maintenance company. The Missouri Supreme Court turned to the maintenance contract to determine the scope of the duty owed by the elevator maintenance company to third persons. The maintenance contract provided only that the elevator company would maintain the elevator system, not install new equipment. Therefore, that court held that the elevator maintenance company had no duty to install new equipment, and it affirmed the trial court's judgment based on the directed verdict.
Similarly, in Hunt, the Missouri Court of Appeals held that the scope of the elevator maintenance company's duty to third persons was to be determined by the provisions of the maintenance and inspection contract. That Court held that the elevator company was obligated to maintain the elevators in good working condition and to inspect them on a monthly basis, but that it was not obligated by the provisions of the contract to undertake to supervise the use of the elevator or to instruct the owner's employees on the proper use of the elevator.
Likewise, we hold that the scope of Otis's duty is to be determined by the provisions of the contract. The contract provides that Otis will "examine periodically all safety devices." The contract further provides that it shall be the hospital's responsibility "to guard and protect the [cartroom] openings during and after loading and unloading operations and to restrict access to the area of the loading, unloading and transfer operations to trained personnel."
The contract required Otis to inspect the elevator as it was installed. It did not require Otis to recommend the specific manner by which the cartveyor system could be made safer. It is undisputed that Otis informed the hospital on more than one occasion that the condition causing the accident in this case was hazardous and that it recommended that the hospital take steps to add a safety device to prevent such accidents as this one from occurring. Moreover, the record contains evidence that representatives of Otis suggested various means by which the cartveyor system could be made safe. We hold that Otis, by informing the hospital of the unsafe condition inherent in the cartveyor system, fulfilled its duty to third persons using the cartveyor system. Thus, the trial court erred in denying Otis' motion for J.N.O.V. on the issue of negligent inspection.
Based on the foregoing, the judgment of the trial court is due to be, and it is hereby, reversed, and the cause is remanded to that court for entry of a judgment consistent with this opinion.
REVERSED AND REMANDED.
HORNSBY, C.J., and MADDOX, SHORES and HOUSTON, JJ., concur.
[1] Otis states in its brief that it first executed a maintenance and inspection contract with the hospital in January 1980, but that it was unable to locate a copy of the contract. In any event, it is not disputed that the parties executed a maintenance and inspection contract on June 10, 1980.
[2] The liability of workmen's compensation insurance carriers to third persons has subsequently been limited by the enactment of Act No. 86, Acts of Ala. 1975, 4th Ex.Session (Ala. Code 1975, §25-5-11).