The plaintiff, Dennis Allen Faulkner, appeals from a judgment entered in favor of the defendant, the University of Tennessee ("UT"), on its motion to dismiss.
This case involves UT's actions directed toward the revocation of a doctoral degree it conferred upon Faulkner in 1989. The issue underlying this appeal is whether the trial court erred in determining that it lacked the jurisdiction to hear this case.
The record indicates that in 1987, associated with his employment with the United States Army at Redstone Arsenal in Huntsville, Faulkner commenced work in Huntsville toward a doctoral degree from UT's Space Institute.
According to the affidavit of Faulkner's UT faculty advisor, Dr. Walter Frost, graduate student programs have been conducted in the Huntsville area by UT's Space Institute for several years. Dr. Frost stated that UT's involvement with graduate students in the Huntsville area has occurred because of a sponsorship agreement between UT and the Federal Government. Dr. Frost stated that he and other UT professors were encouraged by UT to actively recruit students from the technical community within Huntsville, particularly those employed by the Department of the Army or by NASA.
The record indicates that the Army and NASA, together, have paid in excess of $100,000 to UT over the last five years to sponsor such employee students for instruction by UT in Huntsville.
Both Dr. Frost and Faulkner stated that UT also has a number of commercial contracts with NASA and the Army in Huntsville, including UT's involvement in a joint venture with another entity that has been awarded a multi-million dollar contract with NASA. According to Faulkner, UT has also been a participant and sponsor of an annual Huntsville-based trade show.
The affidavits of Dr. Frost, Faulkner, and another UT professor, Dr. Robert Turner, indicate that almost all of Faulkner's course work was completed in Huntsville, where UT held both live and video-taped lectures.
Also, the record indicates that as part of his degree program, Faulkner commenced work on a dissertation in Huntsville. According to Faulkner, after he had completed considerable work on the dissertation, Dr. Frost and others advised him that he would have to abandon that work because it involved data that the Federal Government had decided to "classify." Faulkner alleges that Dr. Frost thereafter suggested that Faulkner write a dissertation based on reports written by others, co-authored by Frost (the "Frost reports"). Faulkner's affidavit indicates that he then commenced preparation of a second dissertation based on the Frost reports, working under the close supervision of Dr. Frost. According to Faulkner, he worked under the guidance of Dr. Frost, in Huntsville, "through innumerable revisions . . . [and] incorporated therein substantial portions of the reports provided him by Frost, as was readily apparent to and authorized by Frost, ultimately without citation to said reports." Faulkner says that while he was preparing it he also consulted Dr. Turner regarding the circumstances of his preparation of this dissertation.
Dr. Turner, Dr. Frost, and three other UT professors made up a faculty panel that was to accept or reject the dissertation as fulfillment of a degree requirement. The record indicates that Drs. Frost and Turner, as well as the other panel members, read Faulkner's completed dissertation and, in Tennessee, orally examined Faulkner regarding it. According to Faulkner, he explained to the panel the circumstances of his preparation of the dissertation. It is undisputed that this panel, including Dr. Frost, approved the dissertation in satisfaction of a degree requirement and that Faulkner, having completed all other degree requirements, was awarded a doctor of philosophy degree from UT in May 1989.
The record indicates that approximately a year later, the dean of UT's graduate school in Knoxville, Tennessee, Dr. C.W. Minkel, wrote Faulkner, stating "[W]e . . . plan to *Page 364 
proceed with the withdrawal of your . . . degree." According to Dr. Minkel's letter, another UT faculty panel had, after Faulkner's graduation, "judged [Faulkner's] dissertation to lack evidence of original work and to constitute essentially a duplication of material in the [Frost] reports." Dr. Minkel added that Faulkner could "proceed in either of two ways." Dr. Minkel stated that Faulkner could voluntarily relinquish his degree or wait for UT's formal, faculty panel request that the degree be rescinded, but that "[i]n either case, a notation would be placed on your transcript . . . that the degree has been rescinded." Dr. Minkel concluded this letter by advising Faulkner that if he desired, UT would afford him a hearing at which he would have the opportunity to prove UT wrong. UT suggests that this hearing would be before UT representatives.
Faulkner declined to surrender his degree, and he refused the proffered hearing, which he characterizes as a "star chamber review."
Faulkner sued UT in the Circuit Court of Madison County, seeking damages and declaratory and injunctive relief. Faulkner asserted fraud, breach of contract, and estoppel. He alleged that he had been forced by UT's actions to forgo the pursuit of beneficial career changes and stated that if UT continued in its stated plan of action he would suffer irreparable harm, professionally and otherwise.
UT moved to dismiss Faulkner's complaint, arguing that the trial court lacked jurisdiction over the case. In substance, the trial court agreed and entered what it called a summary judgment in favor of UT.
We note, at the outset, that a court cannot enter a judgment on the merits against a party after finding that it lacks jurisdiction, because it cannot effectively find that it has no authority to adjudicate a claim, and then proceed to adjudicate the claim anyway. In McMillon v. Hunter, 439 So.2d 153 (Ala. 1983), we emphasized that judgments based on defects in jurisdiction abate, but do not bar, an action. We stated that a "summary judgment procedure deals with the merits" and that a judgment made on jurisdictional grounds "is not a matter for dismissal with prejudice or summary judgment." Id. at 154.
Faulkner argues that any judgment, with or without prejudice, based on a holding that jurisdiction is lacking, is incorrect. Thus, says Faulkner, rather than remanding this case for an order of dismissal without prejudice, we should remand this case for further proceedings because, he says, the trial court has jurisdiction.
Accordingly, we now turn to whether the trial court correctly concluded that it lacked jurisdiction to hear this case.
UT, in substance, asserted three bases in the trial court for its contention that the trial court lacked jurisdiction. It argues these same bases on appeal. Specifically, UT argues (1) that the trial court lacked in personam jurisdiction over UT; (2) that the trial court lacked subject matter jurisdiction over the dispute or, (3) in the alternative, that the courts of Alabama have the discretion to exercise jurisdiction over UT but should decline jurisdiction out of policy concerns.
 In Personam Jurisdiction
Faulkner argues that UT's contacts with the State of Alabama are so prevalent that the existence of in personam jurisdiction is not fairly debatable.
The State of Alabama has in personam jurisdiction over an out-of-state defendant who has "sufficient contacts" with this State, i.e., such contacts "that he reasonably ought to anticipate [that] the direct consequences of his actions [would] be felt by another person residing [here]." Duke v.Young, 496 So.2d 37, 39 (Ala. 1986); Ala.R.Civ.P. 4.2.
Reviewing all the facts and attendant circumstances of this case, we hold that the trial court had in personam jurisdiction over UT.
In the present case, it is undisputed that UT professors were conducting educational programs in Alabama and were soliciting prospective students within Alabama, for the purpose of offering educational instruction. The record indicates that these activities have occurred on a continuing basis for several years. It is further undisputed that Faulkner is and was an Alabama resident who, associated with these acts, was given *Page 365 
considerable educational instruction in Alabama by UT faculty members and who did work in Alabama on the dissertation in question.
Here, it should have been quite foreseeable by UT that the direct consequences of its actions would be felt by one residing in Alabama, e.g., Faulkner. See View-All, Inc. v.United Parcel Service, 435 So.2d 1198, 1201 (Ala. 1983) (finding in personam jurisdiction to exist, where, as here, the nonresident defendants "were engaged in a substantial and continuing business within this state, and . . . the plaintiffs' claim arose out of this course of action").
 Subject Matter Jurisdiction
Stated simply, subject matter jurisdiction is the authority of a court to hear a given class of cases. See Standard Oil Co.v. Montecatini Edison, 342 F. Supp. 125, 129 (D.Del. 1972);Davis v. Davis, 9 Ill. App.3d 922, 293 N.E.2d 399 (1973);Ferree v. Ferree, 285 Ky. 825, 149 S.W.2d 719 (1941).
UT argues that under state law exhaustion of remedies provisions and under the United States Constitution, the trial court is without the authority to hear this case.
Regarding exhaustion of remedies, UT argues that a trial court cannot have subject matter jurisdiction until such time as Faulkner exhausts administrative remedies available to him.
In some instances, a complainant is not entitled to judicial relief involving a decision of an agency of the State of Alabama unless the complainant has first exhausted his or her administrative remedies. Ex parte Graddick, 495 So.2d 1367
(Ala. 1986). However, our law on the subject applies to Alabama agencies. The defendant cites no authority for the proposition that Alabama's exhaustion of remedies doctrine would extend to a remedy provided by a foreign agency; nor are we persuaded by UT's arguments that under the facts of this case we should extend our doctrine to foreign agencies.
We note that before exhaustion of administrative remedies becomes an issue in any case, there must be a administrative remedy available. UT points to no specific authority indicating that a cognizable administrative remedy through UT exists for persons like Faulkner.[1]
However, UT also asserts that the trial court has no authority to adjudicate a claim against it because of the Full Faith and Credit Clause, U.S. Const. Art. IV, § 1.
In this regard, UT says that it would have sovereign immunity from this lawsuit in the State of Tennessee. It says that the Full Faith and Credit Clause requires that this immunitymust also be extended to it by the State of Alabama.
Faulkner strenuously argues that there is no support for this proposition and states that Nevada v. Hall, infra, cited by UT, actually supports a conclusion contrary to that argued by UT.
As often is the case in a discussion of an issue of constitutional law, we could devote lengthy analysis and supply substantial background to this issue. However, the concepts of sovereignty implicated here are so accepted and fundamental that they do not warrant lengthy discussion.
In Nevada v. Hall, 440 U.S. 410, 99 S.Ct. 1182,59 L.Ed.2d 416 (1979), a case involving an examination of the Full Faith and Credit Clause, the United States Supreme Court stated, regarding a claim of sovereign immunity by one State within the boundaries of another: "Such a claim necessarily implicates the power and authority of a second sovereign; its source must befound either in an agreement, express or implied, between thetwo sovereigns, or in the voluntary decision of the second torespect the dignity of the first as a matter of comity." Id.440 U.S. at 415-16, 99 S.Ct. at 1186. (Emphasis added.)
Similarly, in Pacific Employers Insurance Co. v. IndustrialAccident Comm'n, 306 U.S. 493, 59 S.Ct. 629, 83 L.Ed. 940
(1939), cited by Faulkner, the Court stated that "[f]ull faith and credit does not here enable one *Page 366 
state to legislate for the other or to project its laws across state lines so as to preclude the other from prescribing for itself the legal consequences of the acts within it."Id. at 504-05, 59 S.Ct. at 634.
We agree with Faulkner that the Full Faith and Credit Clause does not require that we extend sovereign immunity to UT.
 Discretionary Jurisdiction
UT asserts, in the alternative, that the State of Alabama should, consistent with the doctrine of comity, permissively afford UT the sovereign immunity UT says that it enjoys in the State of Tennessee.
"Comity is . . . a principle of courtesy by which the courts of one jurisdiction will give effect to the laws and judicial decisions of another jurisdiction merely out of deference and respect." State ex rel. Speer v. Haynes, 392 So.2d 1183, 1185
(Ala.Civ.App. 1979), rev'd on other grounds, Ex parte Haynes,392 So.2d 1187 (Ala. 1980).
In determining whether to apply comity, we must remain sensitive to the rights of our own citizens and our duties and obligations to them. Id. We cannot, absent some overriding policy, leave Alabama residents without redress within this State, relating to alleged acts of wrongdoing by an agency of another State, where those alleged acts are associated with substantial commercial activities in Alabama. We conclude that comity is not such an overriding policy in this instance.
UT indicates that granting it sovereign immunity in this case could not be any great burden on the people of Alabama, who, it says, are accustomed to the immunity shared by instrumentalities of this State, and that to extend it to UT here would promote harmony with Tennessee.
We disagree with the suggestion that to extend sovereign immunity to UT would not be appreciably different in effect from the extension of immunity to an agency or instrumentality of the State of Alabama. Agencies of the State of Alabama are subject to legislative control, administrative oversight, and public accountability in Alabama; UT is not. Actions taken by an agency or instrumentality of this state are subject always to the will of the democratic process in Alabama. UT, as an instrumentality of the State of Tennessee, operates outside such controls in this State.
Moreover, if, as UT suggests, comity is an extension of deference, proffered in the interest of harmony or cooperation, then logically, comity is not an issue of import here, given these considerations, unless some disharmony with Tennessee may result in its absence.
UT does not indicate that a failure to extend comity would result in disharmony with the State of Tennessee. Rather, UT asserts only that to extend UT sovereign immunity in this case "is consistent with notions of comity and harmonious interstate relations." That may be true, but that argument fails to address whether a failure to extend comity would beinconsistent with harmonious interstate relations in this instance;[2] it suggests no specific basis for denying Faulkner and other persons similarly situated a remedy in this State, in the interest of preventing disharmony.
REVERSED AND REMANDED.
HORNSBY, C.J., and MADDOX, ALMON, SHORES, ADAMS and INGRAM, JJ., concur.
HOUSTON, J., dissents.
[1] UT does not raise any issue whether, in the absence of a cognizable administrative remedy through it, Dr. Minkel's letter could have created such a remedy.
[2] It is noteworthy that UT cites no authority indicating that the courts of Tennessee would, if confronted with this situation, hold any differently than we do here.