748 So.2d 200 (1998)
STATE DEPARTMENT OF PUBLIC SAFETY
v.
John SEXTON.
John Sexton
v.
State Department of Public Safety, et al.
2960242.
Court of Civil Appeals of Alabama.
June 12, 1998.
*203 William G. McKnight, Montgomery; and Jack M. Curtis, Department of Public Safety, for appellant/cross appellee State Department of Public Safety.
C. Michael Quinn, Deborah A. Mattison, and Jon C. Goldfarb of Gordon, Silberman, Wiggins & Childs, Birmingham, for appellee/cross appellant John Sexton.

On Application for Rehearing
CRAWLEY, Judge.
The opinion of March 20, 1998, is withdrawn and the following opinion is substituted therefor.
The State Department of Public Safety ("DPS") appeals from a judgment entered on a $50,000 jury verdict for John Sexton in an action alleging that DPS discriminated against him in violation of the Americans with Disabilities Act ("ADA"), 42 U.S.C. § 12101 et seq., by determining that he was medically unqualified for a commercial driver's license ("CDL").
DPS also appeals from a judgment of the circuit court, sitting without a jury, on Sexton's administrative appeal from the suspension of his CDL; the circuit court overturned the decision of DPS and held that Sexton was medically qualified for the license. Sexton cross appeals, contending that the trial court erred by entering a summary judgment on his claim, brought pursuant to 42 U.S.C. § 1983, that DPS denied him due process of law in the course of suspending his license.
For the reasons discussed below, we reverse the judgment entered on the jury verdict and remand with instructions for the trial court to enter for DPS a judgment notwithstanding the verdict on the ADA claim. We affirm the judgment on the administrative appeal, and we affirm in part and reverse in part the summary judgment that is the subject of the cross appeal.
Sexton was employed by Poole Truck Lines, Inc., of Evergreen, Alabama. He held a CDL and drove an 18-wheel truck cross-country. On May 21, 1992, he was on his way home after driving 12 to 14 hours straight, when he felt faint, "like someone turning the lights down." He pulled off on the side of the road until the feeling subsided and then he continued home.
A few days later, Sexton consulted a doctor, who took chest X-rays and made an electroencephalogram (EEG); the doctor found no abnormalities and authorized Sexton to return to work. A month later, Sexton had chest pains and, in September 1992, he was referred to a neurologist, Dr. Larry Epperson. Dr. Epperson took a medical history from Sexton, in which he recorded that Sexton had had "five to six episodes of near syncope followed by severe headaches."[1]
Dr. Epperson performed several tests on Sexton, including an EEG and an MRI brain scan. Sexton's test results were normal, with no indication of epilepsy. However, in order to determine whether Sexton had had a seizure, Dr. Epperson prescribed a three-month therapeutic trial of Tegretol, an anti-convulsant medication.
*204 Sexton could not drive while he was on the medication, so he took a three-month leave of absence from Poole Truck Lines. During his leave of absence, Sexton submitted a claim for short-term disability benefits through his employer's insurance program. The application form for the benefits, which Sexton said his wife had filled out, stated that the nature of Sexton's illness was "seizures." Mrs. Sexton testified that she wrote "seizures" in the space marked "nature of illness" because that is the condition for which the doctor was checking her husband. In the section to be completed by the attending physician, Sexton's diagnosis was identified as "syncope, seizures." Dr. Epperson testified that his office manager filled out that section of the application form. The form was signed by Sexton and by Dr. Epperson.
At the end of the therapeutic trial of Tegretol, Dr. Epperson changed Sexton's medication to Dilantin and extended the three-month period for another three months. Sexton continued the anti-convulsant medication until March 1993. At the end of Sexton's first course of medication in December 1992, Poole Truck Lines informed him that, upon review of his medical records, it had determined that he was medically disqualified for employment "in accordance with paragraph 391.41, subpart [b], section 8." That reference is to 49 C.F.R. § 391.41(b)(8), which provides:
"(b) A person is physically qualified to drive a commercial motor vehicle if that person
". . . .
"(8) Has no established medical history or clinical diagnosis of epilepsy or any other condition which is likely to cause loss of consciousness or any loss of ability to control a commercial motor vehicle."
When Sexton received the disqualification notice from Poole, he contacted Dr. Epperson and asked if the physician could help him keep his job. Dr. Epperson agreed to send Poole a letter explaining Sexton's medical condition. On January 5, 1993, Dr. Epperson wrote:
"I am writing in reference to MR. JOHN SEXTON, a forty-seven year old white male who has had five to six episodes of near syncope followed by severe headaches. On several occasions, he had jerking clonic activity of his left arm. He complains of intermittent weakness of the upper extremities for 10-30 minutes and then this resolves. He has had a thorough work up with electroencephalogram, CAT scan and cardiac catheterization, etc. MRI of the brain was negative. Electroencephalogram was also normal. He was given Tegretol on 9/9/92 for a therapeutic trial. He was very drowsy from taking Tegretol. This was slowly discontinued after Dilantin was added. He has been on Dilantin for some time and has had no further near syncope episodes. He is being treated for a presumed partial seizure disorder. Electroencephalograms have been normal and therefore this is a presumptive diagnosis."
When Sexton saw that Dr. Epperson had informed his employer that he had had "five to six syncopal episodes," he contacted Dr. Epperson, told the doctor that he thought that account was inaccurate and explained that he had had only one spell during which he felt faint. He asked Dr. Epperson to write Poole another letter explaining that his office notes were incorrect, that Sexton had had only one syncopal episode (not five or six), and that he had never had a seizure. On January 7, 1993, Dr. Epperson wrote to Poole again, stating that Sexton had had only one "episode of near syncope," that "no blatant obvious seizure has occurred by history," that all of Sexton's tests were negative, and that he had placed Sexton on a therapeutic trial of anti-convulsant medication to test for a possible seizure disorder.
Nevertheless, Poole did not rehire Sexton. In April 1993, Sexton sued Poole in a federal district court, alleging that Poole *205 had violated the ADA by terminating his employment.[2]
In May 1993, DPS notified Sexton to come for an interview with Sgt. Curtis Luther, a DPS hearing officer, as part of an investigation into the status of his CDL. Sexton met with Sgt. Luther and described what had happened on the night of May 21, 1992, when he felt faint and had to stop his truck. He explained that he had sought medical attention, that he had been tested for seizures, and that he had been placed on a trial course of anti-convulsant medication. He provided Luther with a copy of the explanatory letters that Dr. Epperson had sent to Poole Truck Lines, and he brought another letter from Dr. Epperson, dated March 15, 1993, containing the following conclusions:
"MR. SEXTON had a syncopal episode and has had normal work up and no objective etiology to this.... He had no further syncopal episodes.... He will be released to work with no limitations or restrictions. In my opinion, he does not have a seizure disorder and should not be penalized for being placed on a trial of anti-convulsant medications."
At the conclusion of his investigation, Sgt. Luther recommended that Sexton's CDL not be suspended. DPS referred Sexton's case to its medical advisory board, see § 32-6-40 et seq., Ala.Code 1975, and in July 1993, all four doctors on the board unanimously agreed that Sexton should be allowed to keep his CDL. In July 1993, DPS informed Sexton that his CDL had been approved and that his next medical report would be due in a year.
Sexton did not hear from DPS again until November 1993, when he received notification by mail that his CDL had been disqualified and that he could request a hearing. Sexton requested a hearing and, in December 1993, he and his lawyer met with Sgt. Luther. Sexton was allowed to state his position and to fill out a statement. He also provided Sgt. Luther with all the medical information he had, including a letter from Dr. Caudill Miller, Dr. Epperson's partner, whom he had consulted for a second opinion in May 1993. Dr. Miller concurred with Dr. Epperson's diagnosis and added the following comments:
"Mr. Sexton is having trouble keeping his driver's license. The highway patrol regulation of the State of Alabama states that you cannot drive a car for one year after having a seizure, but he has not had a seizure. He has actually not even had a true episode of syncope. There are no neurological restrictions at this time to his driving. It appears that his near syncope was secondary to [low blood pressure] of unknown etiology and I am not restricting his driving at this time. Neurologically, his examination is normal. He seems to be a very reasonable person and I believe his story, but I did question him as to why the [medical] history differed from Dr. Epperson's history."
During the interview with Sgt. Luther, Sexton asked to see the information upon which DPS was relying to disqualify his license. Luther stated that he could not give Sexton that information. Sexton's CDL was officially suspended in December 1993.
Between July 1993, when DPS approved Sexton's license, and December 1993, when it finally suspended the license, DPS received additional information that it considered in determining whether Sexton was qualified for a CDL. The material, upon which DPS relied, but which it did not disclose to Sexton, included, among other things, Sexton's application for disability benefits (indicating that the nature of his illness was "seizures"), a report from a Dr. Kinsey, the company doctor for *206 Poole Truck Lines, the recommendation of another medical advisory board, and information received from Ms. Judy Van Luchene, the state director for the United States Department of Transportation ("DOT") Federal Highway Administration ("FHA") Office of Motor Carriers.
Sexton testified that, if he had known DPS was relying on the use of the word "seizures" in his application for disability benefits to conclude that he was medically disqualified for a CDL, he would have explained to Sgt. Luther that his wife filled out the form and that she had used the word "seizures" as a shorthand way of saying that Sexton was being checked to determine if he had a seizure disorder.
Dr. Kinsey, the Poole company doctor, did not examine Sexton. He did, however, speak with Dr. Epperson and review Dr. Epperson's notes before Sexton was terminated by Poole. Dr. Kinsey sent a report to DPS in which he pointed out what, he thought, were inconsistencies in Dr. Epperson's records regarding whether Sexton had had a syncope or seizure. In the report, Dr. Kinsey gave his opinion that the inconsistencies provided a reason to question Dr. Epperson's recommendations.
Helen McGinty, a DPS clerk whose duties included reviewing driver's license medical files, received the report from Dr. Kinsey. McGinty decided to reopen Sexton's file and to send it, along with Dr. Kinsey's report and a set of DOT guidelines, to a medical advisory board. The guidelines stated that DOT recommended approving a CDL for a driver who had taken anti-convulsant medication if the driver had been off the medication for six months and had been seizure-free. McGinty testified that after she sent the guidelines to the medical advisory board, she learned from Judy Van Luchene that she had been using the wrong guidelines to review CDLs.
Judy Van Luchene supplied DPS with a 1988 DOT task force report containing guidelines on various neurological disorders that can render a driver disqualified to operate a commercial vehicle. Specifically, Van Luchene informed McGinty that anyone who had been on anti-convulsant medication was prohibited from obtaining a CDL for five years.

I. The ADA Claim

DPS contends that the trial court erred by denying its motions for a judgment as a matter of law because, it argues, Sexton did not present sufficient evidence that it violated the ADA by disqualifying him from holding a CDL.
A judgment as a matter of law is proper when the nonmoving party has failed to present substantial evidence regarding some essential element of his claim or when there is no disputed issue of material fact upon which reasonable persons could differ. Rule 50(a), Ala. R. Civ. P.; Driver v. National Sec. Fire & Cas. Co., 658 So.2d 390, 392 (Ala.1995); Ex parte Oliver, 532 So.2d 627, 628 (Ala.1988). No presumption of correctness attaches to a ruling on a motion for a judgment as a matter of law. K.S. v. Carr, 618 So.2d 707, 713 (Ala.1993). Review of such a ruling on appeal is de novo. Otis Elevator of Gadsden, Inc. v. Scott, 586 So.2d 200, 203 (Ala. 1991).
To recover compensatory damages in an ADA action, a plaintiff must prove intentional discrimination on the basis of a disability. See Tyler v. City of Manhattan, 118 F.3d 1400 (10th Cir.1997); Wilson v. Gayfers Montgomery Fair Co., 953 F.Supp. 1415, 1422 (M.D.Ala.1996). A plaintiff may establish a claim under the ADA by presenting direct evidence of discrimination or by using the indirect method of proof established (for cases arising under Title VII of the 1964 Civil Rights Act) by McDonnell Douglas Corp. v. Green, 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973). See Wilson v. Gayfers Montgomery Fair Co., supra. The McDonnell Douglas "burden-shifting" analysis has routinely been applied to the *207 ADA by the federal courts[3] and has been adopted by the Alabama Supreme Court, see Bullion v. JMBL, Inc., 657 So.2d 834, 837 (Ala.1995).[4]
Under the McDonnell Douglas analysis, once an ADA plaintiff has made a prima facie showing that he has been discriminated against on account of a disability, the burden then shifts to the defendant to "articulate some legitimate nondiscriminatory reason" for its action. See McDonnell Douglas, 411 U.S. at 802, 93 S.Ct. 1817. If the defendant meets that burden, the plaintiff must then come forward with evidence that the defendant's "stated reason... was in fact pretext." Id. at 804, 93 S.Ct. 1817. See generally Pouncy v. Vulcan Materials Co., 920 F.Supp. 1566 (N.D.Ala.1996). The defendant's burden is merely one of production; the burden of proving that the defendant's stated reasons are pretextual and that discrimination was the real reason for the adverse action remains at all times with the plaintiff. See St. Mary's Honor Center v. Hicks, 509 U.S. 502, 507-08, 113 S.Ct. 2742, 125 L.Ed.2d 407 (1993).
The plaintiff's threshold burden in an ADA case is to establish that he is "disabled" within the meaning of the statute. EEOC v. Texas Bus Lines, 923 F.Supp. 965, 969 (S.D.Tex.1996). Title II of the ADA provides:
"[N]o qualified individual with a disability shall, by reason of such disability, be excluded from participation in or be denied the benefits of the services, programs, or activities of a public entity, or be subjected to discrimination by any such entity."
42 U.S.C. § 12132. A "public entity" includes any state or local government. 42 U.S.C. § 12131(1). Thus, the elements of a cause of action under Title II of the ADA are: (1) that the plaintiff has a disability; (2) that the plaintiff is nonetheless qualified for the benefit in question; and (3) that the plaintiff was excluded from the benefit by a public entity because of discrimination based on his disability. See Williams v. Wasserman, 937 F.Supp. 524, 527 (D.Md.1996).
DPS maintains that Sexton did not establish either that he is a "qualified individual with a disability," or that it discriminated against him on the basis of a disability. As used in Title II of the ADA, the phrase "qualified individual with a disability" is a term of art meaning "an individual with a disability who, with or without reasonable modifications ..., meets the essential eligibility requirements for the receipt of services or the participation in programs or activities provided by a public entity." 42 U.S.C. § 12131(2).
"The term `disability' means, with respect to an individual
"(A) a physical or mental impairment that substantially limits one or more of the major life activities of such individual;
"(B) a record of such an impairment; or
"(C) being regarded as having such an impairment."
*208 42 U.S.C. § 12102(2). Working is a "major life activity." 29 C.F.R. § 1630.2(i)(1994). However, "`the inability to perform a single, particular job does not constitute a substantial limitation in the major life activity of working.' 29 C.F.R. § 1630.2(j)(3)(i)(1994)." Bullion v. JMBL, Inc., 657 So.2d at 837.
"In order to establish the first element of a prima facie case under the Americans with Disabilities Act ..., [a plaintiff] must set forth that [he is] disabled (which includes, by statutory definition, being so regarded)."
Andrews v. Ohio, 104 F.3d 803, 808 (6th Cir.1997). See also Richards v. City of Topeka, 934 F.Supp. 378, 382 (D.Kan.1996) ("It is well established that to bring forth an ADA claim a person must establish that she is disabled.").
Sexton does not claim that he is disabled. On the contrary, he insists that he is not disabled and that there is no medical reason why he should not have a CDL. Instead, he contends that DPS "regarded [him] as having" a disability known as syncope, or seizures, and that DPS denied him a CDL on the basis of its perception that he had that disability. DPS argues that it did not regard Sexton as disabledthat it merely regarded him as unqualified for a CDL under federal (DOT) regulations.
That argument has succeeded in at least four other ADA cases involving drivers of commercial vehicles. See Prado v. Continental Air Transport Co., 982 F.Supp. 1304 (N.D.Ill.1997); Rice v. Genova Products, Inc., 978 F.Supp. 813, 822 (N.D.Ind. 1997); Murphy v. United Parcel Service, Inc., 946 F.Supp. 872 (D.Kan.1996); Campbell v. Federal Exp. Corp., 918 F.Supp. 912 (D.Md.1996). Cf. Sutton v. United Air Lines, Inc., 130 F.3d 893 (10th Cir.1997) (airline pilot).
In Prado, an applicant who was rejected as a driver for a passenger transportation company because he had an atrophied leg sued the company, alleging disability discrimination in violation of Title I of the ADA. The company defended on the basis that the applicant was not denied employment because he was disabled, but because he failed to meet the requirements for DOT certification. The United States District Court for the Northern District of Illinois agreed and granted the company's motion for a summary judgment.
In Rice, a truck driver sued his employer, alleging that his termination because of syncope violated Title I of the ADA. The employer asserted the following defense:
"Genova contends that plaintiff is not a qualified individual under the ADA because the company did not perceive him as disabled. Rather, the company contends, it merely perceived him as uncertifiable under DOT regulations and, relying on the medical evidence it received, felt it had no choice in not allowing him to drive trucks."
978 F.Supp. at 818. The United States District Court for the Northern District of Illinois held that "if Genova [the employer] believed, as it contends, that Rice [the employee] had syncope, then it had a legitimate reason to believe that he could not be recertified so as to satisfy the DOT regulations." 978 F.Supp. at 819. The court concluded that "[r]eliance on DOT regulations, absent pretext, is a defense to a truck driver's ADA lawsuit." Rice v. Genova Products, Inc., 978 F.Supp. at 822.
In Murphy, a commercial truck mechanic sued his former employer, alleging that his termination because of high blood pressure violated Title I of the ADA. The United States District Court for the District of Kansas noted that DOT regulations require drivers of commercial vehicles to have blood pressure readings below a certain level. The court then determined that "UPS did not regard Murphy as disabled, only [as] not certifiable under DOT regulations." 946 F.Supp. at 882. As in Rice, the court in Murphy held that a defendant "may rely on DOT regulations as a defense to an ADA discrimination claim." 946 F.Supp. at 883.
*209 The Murphy court discussed two reasons for deciding that reliance on DOT regulations constitutes a defense to an ADA claim. First, the regulations implementing the ADA specifically provide for the defense. 29 C.F.R. § 1630.15(e) states:
"It may be a defense to a charge of discrimination under this part that a challenged action is required or necessitated by another Federal law or regulation, or that another Federal law or regulation prohibits an action (including the provision of a particular reasonable accommodation) that would otherwise be required by this part."
See also 42 U.S.C. § 12113; 29 C.F.R. § 1630.15(b)(1) and (c) (setting out the defense of "business necessity"); Riel v. Electronic Data Systems Corp., 99 F.3d 678 (5th Cir.1996); Daugherty v. City of El Paso, 56 F.3d 695 (5th Cir.1995), cert. denied, 516 U.S. 1172, 116 S.Ct. 1263, 134 L.Ed.2d 211 (1996); Smith v. City of Des Moines, Iowa, 99 F.3d 1466 (8th Cir.1996).
Second, the legislative history of the ADA makes it plain that Congress did not intend, by enacting the ADA, to abolish physical qualification standards for commercial truck drivers.
"With respect to covered entities subject to rules promulgated by the Department of Transportation regarding physical qualifications for drivers of certain classifications of motor vehicles, it is the Committee's intent that a person with a disability applying for or currently holding a job subject to these standards must be able to satisfy any physical qualification standard that is job related and consistent with business necessity in order to be considered a qualified individual with a disability under Title I of this legislation."
H.R.Rep. No. 101-485(11), 101st Cong., 2d Sess. 57 (1990), reprinted in 1990 U.S.C.C.A.N. 303, 339 (quoted in Murphy v. United Parcel Service, Inc., 946 F.Supp. at 884).
In Campbell, an applicant for a courier position sued the prospective employer, alleging that when it withdrew a conditional offer of employment based on the applicant's inability to "power grasp," the prospective employer violated Title I of the ADA. The United States District Court for the District of Maryland concluded that the applicant had failed to prove either that he was "qualified" or that he was "disabled" under the ADA, and it affirmed a summary judgment for the prospective employer. The court held: "As a matter of law, Federal Express has neither `relied on a record' of Campbell's medical history, nor did Federal Express `regard' Campbell as `disabled'; it regarded him as not certifiable under DOT regulations." 918 F.Supp. at 920 n. 10
In Sutton, applicants for commercial airline pilot positions who were rejected for employment on the basis that their uncorrected vision disqualified them, sued the airline, alleging disability discrimination in violation of the ADA. In response to the plaintiffs' argument that they were regarded as disabled by the airline, the airline maintained that the applicants "merely `failed to meet the rational job-related safety requirements of the positions they sought.'" 130 F.3d at 904. The United States Court of Appeals for the Tenth Circuit agreed that the applicants had failed to prove that they were disabled under the "regarded as" portion of the definition of "disability." The court explained:
"An employer does not necessarily regard an employee as substantially limited in the major activity of working simply because it believes that individual is incapable of performing a particular job.... [I]n order to establish a disability under the `regarded as' prong of the ADA with respect to the major life activity of working, an individual must show that the employer regarded him or her as being substantially limited in performing *210 either a class of jobs or a broad range of jobs in various classes."
130 F.3d at 904.
In School Bd. of Nassau County, Fla. v. Arline, 480 U.S. 273, 107 S.Ct. 1123, 94 L.Ed.2d 307 (1987), the United States Supreme Court explained the rationale for the "regarded as" prong of the definition of "disability."[5] The Court recognized that, by including "regarded as" in the definition of "disability," Congress "acknowledged that society's accumulated myths and fears about disability and diseases are as handicapping as are the physical limitations that flow from actual impairment." 480 U.S. at 284, 107 S.Ct. 1123. The EEOC "Interpretive Guidance" to the ADA and the legislative history of the ADA explain that the "regarded as" prong of the definition of "disability" was designed to protect individuals from the "myths, fears, and stereotypes" associated with disabilities. See Appendix to Part 1630, 29 C.F.R. Pt. 1630 App. § 1630.2(1) at 342; H.R.Rep. No. 101-485 at 29 (1990), 1990 U.S.C.C.A.N. 445, 451, 452.
Sexton presented no evidence that a conclusion by DPS that he had a "clinical diagnosis of ... [syncope or seizures] ..., [a] condition which is likely to cause loss of consciousness or ... loss of ability to control a commercial motor vehicle," was based on any "myths, fears, and stereotypes" associated with disabilities. Here, as in Wooten v. Farmland Foods, 58 F.3d 382, 386 (8th Cir.1995), "[t]he evidence bearing on [the defendant's] perception of [the plaintiff's] impairment indicates that its perception was not based upon speculation, stereotyping, or myth, but upon a doctor's written [assessment of the plaintiff's] physical [condition]."
DPS was presented with conflicting medical evidence as to whether Sexton had "a clinical diagnosis of ... [syncope or seizures] ..., [a] condition which is likely to cause loss of consciousness," and it resolved the conflict adversely to Sexton. Sexton argues that, in assessing his medical condition, DPS relied on the wrong evidence. Specifically, he contends that DPS erroneously considered Dr. Kinsey's opinion because Dr. Kinsey never examined him and merely reviewed another doctor's records.
The same argument was made and rejected by the court in Rice, supra. In that case, a truck driver argued that the medical judgment of a Dr. Hickman, the company doctor, was entitled to no weight because the doctor had not examined him. The court held:
"Perhaps it would have been prudent for Dr. Hickman to examine Rice. But that is not the point. Dr. Hickman, after reviewing Rice's medical records, concluded that Rice's medical condition was such that he could not meet the DOT regulations for recertification.... Genova had a right to rely on that medical opinion. It matters not the basis on which that opinion was formed, only that it was communicated to Genova and the company relied on it in making its employment decisions regarding Rice."
978 F.Supp. at 821. The fact that Dr. Kinsey's opinion was communicated to DPS and that DPS relied on it, tends to show that DPS did not "regard" Sexton as disabled, but as medically unqualified. We conclude that Sexton failed to prove that DPS "regarded" him as disabled or "relied on a record" indicating that he was disabled.
*211 Sexton next argues that he proved he was "qualified" for a CDL (part of the requirement that he establish himself to be a "qualified individual with a disability"). He claims that he established that he was qualified to drive, by demonstrating that DPS misinterpreted the medical evidence and misconstrued DOT requirements, thereby reaching the wrong conclusion about his qualification to drive.
Sexton maintains, for example, that he showed the error of DPS's reliance on the 1988 DOT task force report that Judy Van Luchene supplied to Helen McGinty. Sexton insists that Van Luchene and McGinty misconstrued the report by interpreting it to require that anyone who had ever taken anti-convulsant medication be prohibited from driving a commercial vehicle for five years. Sexton contends that the five-year prohibition applies only to those who have actually had a seizure. Thus, he claims, he is excluded from the prohibition because the medical evidence shows, he says, that he never had a seizure.
This court finds Sexton's argument that DPS unfairly evaluated the conflicting medical evidence and reached an erroneous conclusion about his qualification for a CDL unavailing because Sexton bypassed a procedure that would have resolved the conflict in the medical evidence expeditiously and expertly. As outlined in 49 C.F.R. § 391.47, DOT provides a method for resolving medical conflicts about whether a driver is qualified for a commercial license.
"In a case where there are conflicting medical evaluations, ... the driver may submit an application for resolution of the conflict to the Director of the Office of Motor Carrier Research and Standards [`OMCRS']. Within sixty days of the Director's determination, the driver or motor carrier may appeal the decision to the Associate Administrator. Thereafter, judicial review is available."
Campbell v. Federal Express Corp., 918 F.Supp. at 917-18 (citations omitted).
In Campbell, an applicant for a position as a Federal Express courier challenged the competence of the nurse practitioner who examined him and determined that he was not qualified to drive. The applicant had previously passed a DOT physical examination administered by another employer. The court decided that the applicant was precluded from challenging, for the first time within the context of an ADA claim, the determination by Federal Express that he was unqualified. It was "persuaded by the logic of [the following contentions by Federal Express] on this issue of first impression":
"Federal Express argues that Campbell should be required to exhaust the remedies provided under DOT's regulatory scheme, and furthermore, that the doctrine of primary jurisdiction should be invoked by this Court, and this Court should accordingly defer to the expertise of DOT to determine Campbell's qualifications under DOT regulations."
918 F.Supp. at 917. The court explained that "[i]t is exactly because reasonable medical judgments as to ... subjective assessments, made in good faith, may reasonably differ, that an extra-statutory exhaustion requirement is justified." 918 F.Supp. at 918. The court stated another reason for requiring exhaustion:
"Exhaustion of DOT procedures should be required in the instant case because a critical element of Campbell's case, namely whether Campbell met DOT qualifications for the courier position, falls squarely within the regulatory scheme (and substantive experience) of DOT."
Id. Finally, the court pointed out the following consideration, which is particularly significant in the instant case:
"The unique circumstances presented here militate strongly in favor of the doctrine of primary jurisdiction. It is not reasonable to conclude that Congress could have intended that juries would serve as the ultimate arbiters of the meaning and application of DOT *212 regulations, but this is exactly the result that will obtain if Campbell is permitted to litigate in the first instance the propriety of Federal Express's reliance on [its medical officer's] recommendations. Federal Express (and similarly situated motor carriers) would be left to grave uncertainties as to how to conduct their business."
918 F.Supp. at 919. The court concluded:
"Campbell may not call into question under the ADA whether DOT standards were properly followed without first exhausting available DOT procedures that could have provided him prompt and compete relief."
918 F.Supp. at 919-20. See also Prado v. Continental Air Transport Co., wherein the court stated:
"It is undisputed that Prado failed to pursue his administrative remedies under 49 C.F.R. § 391.47 before filing his complaint with the court. The court will not abrogate clear congressional intent which vests driver fitness issues in the Secretary of Transportation. [49] U.S.C. § 31136(a)(3). Nor will the court usurp the power of the OMCRS to determine whether a physician's examination procedures were flawed or [the physician's] conclusions erroneous. 49 C.F.R. § 391.47."
982 F.Supp. at 1308.
It does not appear that DPS has a mechanism similar to the one outlined in 49 C.F.R. § 391.47 that guarantees the resolution of a medical conflict by a medical expert. Although § 32-6-42, Ala.Code 1975, authorizes DPS to convene a medical advisory board to "evaluate individual problem cases," § 32-6-44 states that the advice of the board is not binding on DPS. While subsection (a) of § 32-6-7.1, Ala. Code 1975, states a policy of not discriminating against the disabled in the issuance of driver's licenses, subsection (b) of the statute allows DPS to refuse to issue a license if it has "probable cause to believe the [applicant's] ability to operate a motor vehicle in a safe manner is in fact impaired." Probable cause does not demand a high degree of assurance in fact-finding. See Pannell v. Reynolds, 655 So.2d 935, 939 (Ala.1994) ("In a civil proceeding, `"`all that is necessary [for probable cause] is that the claimant reasonably believe that there is a chance that [the] claim may be held valid upon adjudication'"'") (brackets added by the court in Pannell) (citations omitted).
In a difficult case, DPS is not required even to convene a medical advisory board, and if it does convene a medical advisory board, it is not required to rely on the board's advice; DPS can deny a license based on probable cause to believe the applicant is impaired enough to be unsafe. Because actual resolution of a medical conflict by a medical expert well-versed in DOT requirements would appear, from the perspective of a plaintiff in Sexton's position, to be preferable to a probable cause determination by a state administrative agency, we consider that an exhaustion requirement has much to commend it.
Sexton argues that DPS did not raise the exhaustion argument in the circuit court and, he claims, DPS is therefore precluded from raising it for the first time on appeal. We disagree. DPS phrased its argument below in terms of Sexton's being "estopped" to complain about (or Sexton's having "waived" his right to criticize) DPS's resolution of the conflict in medical evidence. In support of that argument, DPS cited 49 C.F.R. § 391.47. We conclude that the issue, although not identified as one of "exhaustion," was fairly raised and argued below.
Sexton also argues that, while Title I of the ADA requires a plaintiff to exhaust his administrative remedies before filing an action in court, Title II has no such requirement. Sexton is correct that Title I of the ADA incorporates the procedures of Title VII of the Civil Rights Act, see 42 U.S.C. § 12117(a), and requires a plaintiff to exhaust his remedies with the EEOC before proceeding to court, see 42 U.S.C. *213 § 2000e-5(e), (f)(1). On the other hand, Title II of the ADA adopts the procedures of § 505 of the Rehabilitation Act, see 42 U.S.C. § 12133, and does not mandate that a plaintiff seek redress from the EEOC before filing in court. We think the distinction between Title I and Title II, for present purposes, relates only to whether a plaintiff must first pursue his available remedies with the EEOC, and has no bearing on whether a plaintiff like Sexton should be required to exhaust any other administrative remedies he may have.
We acknowledge that this is an issue of first impression and, in the absence of controlling authority, we are persuaded by the reasoning of the courts in Campbell and Prado. We adopt their holdings, at least insofar as they would preclude a plaintiff in an ADA action from challenging the application of DOT standards without pursuing the remedies set out in 49 C.F.R. § 391.47.
Because Sexton did not exhaust the administrative remedies available to resolve a conflict in the medical evidence and to determine whether he was medically qualified to drive a commercial vehicle under DOT regulations, he was not entitled to litigate whether DPS misapplied those regulations and whether he was qualified under DOT standards. We conclude that in Sexton's ADA action he first failed to prove that he had a "disability," and that he then was precluded, by the doctrine of exhaustion of administrative remedies, from establishing that, notwithstanding the adverse determination by DPS, he was, nonetheless, "qualified" for a CDL. We therefore hold that Sexton did not present a prima facie case under the ADA.
In the alternative, we hold that even if Sexton had presented a prima facie case, DPS asserted a legitimate, nondiscriminatory reason for denying him a license, namely: that based on its review of the medical evidence, it determined that the DOT regulation found at 49 C.F.R. § 391.41(b)(8) precluded Sexton from driving a commercial vehicle. "Reliance on DOT regulations, absent pretext, is a defense to a truck driver's ADA lawsuit." Rice, 978 F.Supp. at 822. "[I]t is plain that in the absence of a showing of pretext, and provided the DOT certification is `job related' and consistent with `business necessity,' [a trucker's] failure to obtain the required DOT certification is a complete defense to his [ADA] claim." Murphy v. United Parcel Service, 946 F.Supp. at 884. Sexton presented no evidence that the reasons given by DPS for denying him a CDL were pretextual.
For purposes of deciding whether DPS came forward with a nondiscriminatory reason for suspending Sexton's license, we need not decide whether the five-year prohibition contained in the 1988 DOT task force report applied to Sexton. Even if it did not apply to him, there was no evidence that DPS's reliance on the report was other than in good faith. See Ward v. Skinner, 943 F.2d 157 (1st Cir.1991), cert. denied, 503 U.S. 959, 112 S.Ct. 1558, 118 L.Ed.2d 207 (1992) (DOT was entitled to rely on blanket prohibition in task force report without individual inquiry into particular driver's circumstances).
"`Pretext means more than a mistake on the part of the employer; pretext "means a lie, specifically a phony reason for some action." ... It is not sufficient... for the employee to show that the employer acted incorrectly or undesirably in firing him; the employee must show that the employer did not honestly believe in the reasons it gave for firing him.'"
Rice v. Genova Products, Inc., 978 F.Supp. at 821-22 (quoting Wolf v. Buss (America), Inc., 77 F.3d 914, 919 (7th Cir.), cert. denied, 519 U.S. 175, 117 S.Ct. 175, 136 L.Ed.2d 116 (1996)) (quoting, in turn, Russell v. Acme-Evans Co., 51 F.3d 64, 68 (7th Cir.1995)) (emphasis added).
Even if Sexton had proved that DPS was mistaken in its conclusions about his medical history, or incompetent in the handling of his license suspension, that proof *214 would not have established that its reasons for the challenged action were pretextual. "`The fact that the employer was mistaken or based its decision on bad policy, or even just plain stupidity, goes nowhere as evidence that the proffered explanation is pretextual.'" Rice v. Genova Products, Inc., 978 F.Supp. at 818-19 (quoting Essex v. United Parcel Service, Inc., 111 F.3d 1304, 1310 (7th Cir.1997)).

II. The Administrative Appeal of the License Suspension

In Part I of this opinion, we adopted the holdings in Campbell v. Federal Express Corp., 918 F.Supp. at 919-20, and Prado v. Continental Air Transport, 982 F.Supp. at 1308, that a plaintiff may not, in an ADA claim, question whether DOT standards were properly followed, without first exhausting available DOT procedures that could provide the plaintiff with prompt and compete relief. Applying that exhaustion requirement to the administrative appeal of Sexton's license suspension would result in the dismissal of his appeal for failure to exhaust the administrative remedies available from DOT for resolving medical conflicts.
Although we hold that Sexton could not challenge, for the first time in the context of his ADA claim, the application of DOT regulations by DPS, we conclude that he should not be barred, in his administrative appeal from the license suspension, by his failure to seek from DOT a resolution of the medical conflict through 49 C.F.R. § 391.47.
In Faulkner v. University of Tennessee, 627 So.2d 362 (Ala.1992), cert. denied, 510 U.S. 1101, 114 S.Ct. 943, 127 L.Ed.2d 233 (1994), the University of Tennessee ("UT") threatened to revoke Faulkner's doctoral degree. UT officials informed Faulkner that he could request a hearing before UT representatives in order to present his side of the controversy. Faulkner, however, did not request a hearing; instead, he sued UT in an Alabama court. UT argued that the Alabama court did not have jurisdiction to hear the dispute until Faulkner had exhausted the remedies available to him through UT. Our supreme court disagreed. The court held that the exhaustion of administrative remedies requirement "applies to Alabama agencies." 627 So.2d at 365 (emphasis added). The court continued:
"The defendant cites no authority for the proposition that Alabama's exhaustion of remedies doctrine would extend to a remedy provided by a foreign agency; nor are we persuaded by UT's arguments that under the facts of this case we should extend our doctrine to foreign agencies."
Id. Based on Faulkner, we decline to apply the federal exhaustion requirement to the state administrative appeal of the license suspension. Although DOT regulations offer a solution for truck drivers in Sexton's circumstances, DOT is a foreign agency. Faulkner holds that an Alabama plaintiff is not required to exhaust the remedies provided by a foreign agency before resorting to an Alabama court.
Sections 32-5A-195(q) and 32-6-7.1(c) provide for an appeal to the circuit court for trial de novo from a DPS decision denying, revoking or suspending a license. Based on those statutes, Sexton appealed the decision to suspend his CDL. On September 30, 1996, the trial court entered the following order setting aside the license suspension and reinstating Sexton's CDL:
"This matter comes before the Court on the appeal of the determination of the Director of the Department of Public Safety to suspend the license of the Claimant John B. Sexton. The Court after hearing the evidence at trial in conjunction with the trial for damages under ADA, and having taken into account those matters submitted to the Court for consideration in its decision which were otherwise excluded during the jury trial for damages and the Court being aware that the jury verdict excluded any finding by the jury that the Plaintiff John B. Sexton had suffered a *215 seizure, finds that John B. Sexton suffered either a syncope or near syncope of undetermined origin on May 21, 1992; that although conflicting records exist as to what transpired thereafter, the Plaintiff suffered no seizure at any time, suffered no further syncope or near syncope, nor took any anti-[convulsant] medication after March 15, 1993; and that in view of such findings the Department of Public Safety applied the wrong standard for determining him ineligible to hold a commercial driver's license.
"[The] decision of the Director is overturned and rendered for naught and the said John B. Sexton is determined to be medically qualified to hold a commercial driver's license.
"It is further ordered that the Director shall in future cases involving the Medical Advisory Board make available to any claimant, for purposes of the hearing prescribed in Section 32-5195(1) of the Code of Alabama, such medical evidence as is considered by the Department so that the claimant shall have an opportunity to rebut the same."
Our standard of review on appeal of a judgment by the circuit court after that court's de novo review of an administrative ruling is whether the circuit court's judgment is "affected by [an] error of law," § 41-22-20(k)(5), Ala.Code 1975, or is "clearly erroneous in view of the reliable, probative, and substantial evidence on the whole record," § 41-22-20(k)(6), Ala.Code 1975. See also Benton v. Alabama Bd. of Medical Examiners, 467 So.2d 234 (Ala. 1985).
Sexton's allegation that DPS unfairly evaluated the conflicting medical evidence and reached an erroneous conclusion about his qualification for a CDL was supported by substantial evidence before the circuit court on appeal of the administrative ruling. From the evidence presented, the circuit court could properly find, as Sexton argued, that DPS had incorrectly evaluated the medical evidence.
For example, some of Dr. Kinsey's conclusions were shown to have been based on erroneous factual assumptions. Likewise, the trial court could have concluded that DPS misinterpreted DOT regulations, particularly the 1988 DOT task force report. The court could have determined that the five-year prohibition against driving after taking anti-convulsant medication applied only to those who had actually had a seizureand that Sexton had never had a seizure.
The trial court's judgment reinstating Sexton's CDL is due to be upheld.

III. The Due Process Issue on the Cross Appeal

Sexton cross appeals from the summary judgment on his 42 U.S.C. § 1983 claim, arguing that four defendants denied him due process of law by failing to provide him with a hearing before suspending his CDL. On that claim, Sexton named the following defendants: DPS; Lt. Robert Gilliland, in his official capacity as commander, CDL/Medical Unit, Driver License Division of DPS; and Sgt. Curtis Luther and Ms. Helen McGinty, in their individual and official capacities.
Due process requires that before the State suspends a driver's license, it must provide the licensee with notice and a hearing. Bell v. Burson, 402 U.S. 535, 91 S.Ct. 1586, 29 L.Ed.2d 90 (1971). In 1976, the United States District Court for the Middle District of Alabama held, in Tolbert v. McGriff, 434 F.Supp. 682, 685 (M.D.Ala. 1976), that an interview with an investigating officer, like the meeting Sexton had with Sgt. Luther in this case, is not equivalent to a "hearing." In Smith v. McGriff, 434 F.Supp. 673, 680 (M.D.Ala.1976), the same court held that at a due process hearing a driver must be given the opportunity to present evidence, to call and cross-examine witnesses, to confront the evidence against him, and to rebut the government's case.
Specifically, Sexton argues that he was denied due process when DPS failed *216 to inform him of the information on which it was relying to suspend his license. DPS contends that § 32-6-43, Ala.Code 1975, which was enacted in 1980, after the decisions in Tolbert and Smith, prohibited Sexton's access to the information. In 1993, that statute provided:
"Reports or records, received or made by the [Driver License Medical Advisory Board] or any of its members, or by the director's office, pursuant to this division for the purpose of assisting the director in determining whether a person meets the medical, physical, or mental standards to be licensed as a driver are for the confidential use of the board and the director's office, and such reports or records shall not be divulged to any other person, federal, state, or local government or private entity, or used as evidence in any trial, except that the reports or records may be submitted in proceedings under the provisions of Section 32-5A-195 [cancellation, suspension, or revocation of driver's licenses]."
(Emphasis added.)[6]
In Sexton v. Poole Truck Lines, 888 F.Supp. 127 (M.D.Ala.1994), DPS moved to quash a subpoena directing it to produce the documents in Sexton's CDL file, arguing that the records in Sexton's file were privileged by virtue of § 32-6-43. The United States District Court for the Middle District of Alabama agreed that the records were privileged under state law. The court, however, discerning a strong federal interest that outweighed the application of the privilege in a federal action, ordered production of the records.
Tolbert and Smith state what is constitutionally required when DPS seeks to disqualify a license on medical grounds: DPS must disclose to the licensee the evidence on which it relies for disqualification. Section 32-6-43 could not alter what was compelled by due process, because a statute that burdens or impairs a right guaranteed by the Constitution offends the Constitution. See Moore v. Mobile Infirmary Ass'n, 592 So.2d 156, 163 (Ala.1991). Sexton was entitled to declaratory and injunctive relief on his due process claim.
As to his claim for compensatory damages, however, the trial court properly entered the summary judgment for all defendants. The State of Alabama, its agencies, and its officials acting in their official capacities are not considered "persons" for purposes of an action for damages under 42 U.S.C. § 1983. Hafer v. Melo, 502 U.S. 21, 27, 112 S.Ct. 358, 116 L.Ed.2d 301 (1991). The trial court, therefore, correctly entered the summary judgment on Sexton's § 1983 damages claim with respect to DPS, and with respect to Lt. Gilliland, Sgt. Luther, and Ms. McGinty in their official capacities.
In their individual capacities, Sgt. Luther and Ms. McGinty were entitled to qualified immunity from liability under § 1983 if their actions were undertaken in good faith and did not violate clearly established rights.
"In their individual capacities ... state officials may be liable for damages resulting from discretionary acts that violate `clearly established statutory or constitutional rights of which a reasonable person would have known.'"
George v. McIntosh-Wilson, 582 So.2d 1058, 1061 (Ala.1991) (quoting Harlow v. Fitzgerald, 457 U.S. 800, 818, 102 S.Ct. 2727, 73 L.Ed.2d 396 (1982)).
"In order to defeat a qualified immunity defense, the plaintiff `bears the burden of showing that "the legal norms allegedly violated by the defendant were clearly established at the time of the challenged actions."'"

Id. (quoting Barts v. Joyner, 865 F.2d 1187, 1190 (11th Cir.), cert. denied, 493 U.S. 831, 110 S.Ct. 101, 107 L.Ed.2d 65 (1989)) (emphasis added). A right is "clearly established" when its "contours [are] sufficiently clear that a reasonable *217 official would understand that what he is doing violates that right." Anderson v. Creighton, 483 U.S. 635, 640, 107 S.Ct. 3034, 97 L.Ed.2d 523 (1987).
"Thus, `pre-existing law must dictate, that is, truly compel (not just suggest or allow or raise a question about) the conclusion for every like-situated, reasonable government agent that what defendant is doing violates federal law in the circumstances.' Lassiter v. Alabama A & M Univ., Bd. of Trustees, 28 F.3d 1146, 1150 (11th Cir.1994) (en banc)."
Dolihite v. Maughon, 74 F.3d 1027, 1041 (11th Cir.), cert. denied sub nom. Dolihite v. King, 519 U.S. 870, 117 S.Ct. 185, 136 L.Ed.2d 123 (1996).
In support of his motion for a summary judgment, Sgt. Luther stated that he did not understand, in December 1993, that he was violating Sexton's rights by failing to disclose to Sexton the evidence on which DPS was relying to suspend Sexton's license. In opposition to the motion, Sexton cited Tolbert and Smith. Those cases were decided in 1976. In 1980, the Alabama legislature enacted § 32-6-43, a statute that purported to carve out an exception to Tolbert and Smith by establishing a nondisclosure privilege for certain records held by DPS.
Sgt. Luther testified that he thought § 32-6-43 prohibited the disclosure of reports or records received by DPS for the purpose of assisting the director in determining whether a person meets the medical standards to be licensed as a driver. Luther stated that he had been through DPS training sessions at which he was instructed not to release the kind of information about which Sexton complains. Because § 32-6-43 could have appeared to provide an exception to the holdings of Tolbert and Smith, the trial court could have concluded that Sgt. Luther acted in good faith and did not knowingly violate Sexton's clearly established rights by failing to inform Sexton of the evidence DPS was relying on to suspend his license.
Ms. McGinty made the decision to reopen Sexton's file and to send it, along with information she received about Sexton, to a second medical advisory board. McGinty testified that she reviewed thousands of files every year and that it was very rare to see a file with conflicting medical evidence. She said that if she had any doubt about what action to take in a medical qualification case, she sent that file to a medical advisory board. McGinty testified that she sent Sexton's file to a medical advisory board after she received information from Dr. Kinsey, from Marie Maness in the CDL unit at DPS, and from Judy Van Luchene at DOT.
The record before us contains no evidence indicating that McGinty's actions were other than a good faith exercise of discretion. Because DPS needed only "probable cause to believe that [Sexton's] ability to operate a motor vehicle in a safe manner [was] in fact impaired" in order to suspend his license, see § 32-6-7.1(b), Ala. Code 1975, McGinty needed even less reason to reopen Sexton's file and send it to a medical advisory board. We conclude that McGinty, like Luther, was entitled to qualified immunity from liability under § 1983.

IV. Issues Not Decided

Relying on Outlaw v. City of Dothan, Ala., (No. CV-92-A-1219, April 27, 1993) (M.D.Ala.1993) (not published in Federal Supplement), and Tyler v. City of Manhattan, 849 F.Supp. 1442 (D.Kan.1994), aff'd, 118 F.3d 1400 (10th Cir.1997), DPS argues that the circuit court erred by denying its motion to strike Sexton's jury demand because, it contends, while jury trials are allowed under Title I of the ADA, Title II does not provide for a jury trial. Because we have determined that Sexton's ADA claim should never have reached the jury, we leave the resolution of this question for another day. For the same reason, we need not decide whether the circuit court erred in denying numerous written charges requested by DPS.
The circuit court's judgment on the jury verdict is reversed, and the cause is remanded with instructions to enter a judgment as a matter of law for DPS on *218 the ADA claim. The circuit court's judgment on the administrative appeal is affirmed. The circuit court's judgment on the due process claim from which Sexton cross appeals is affirmed with respect to the prayer for compensatory damages, but reversed with respect to the prayer for declaratory and injunctive relief.
OPINION OF MARCH 20, 1998, WITHDRAWN; OPINION SUBSTITUTED; APPLICATION OVERRULED; RULE 39(k) MOTION DENIED; AFFIRMED IN PART; REVERSED IN PART; AND REMANDED WITH DIRECTIONS.
THOMPSON, J., concurs.
ROBERTSON, P.J., and YATES, J., concur in the result.
MONROE, J., concurs in part and dissents in part.
MONROE, Judge, concurring in part and dissenting in part.
Because I would affirm the judgment of the trial court, I must respectfully dissent from that part of the main opinion that reverses the trial court's judgment.
NOTES
[1] In deposition testimony, Dr. Epperson explained that a syncope is a loss of consciousness. He said that "`near syncope' means a `faintingness,' and `syncope' implies passing out."
[2] Sexton later filed a bankruptcy petition. The trustee in bankruptcy settled Sexton's lawsuit against Poole under terms not fully disclosed by the record before us. In Part III of this opinion, we cite the holding as to a collateral issue in that lawsuit. See Sexton v. Poole Truck Lines, Inc., 888 F.Supp. 127 (M.D.Ala.1994).
[3] See, e.g., EEOC v. Amego, Inc., 110 F.3d 135 (1st Cir.1997); Fisher v. Vassar College, 114 F.3d 1332 (2d Cir.1997), cert. denied, 522 U.S. 1075, 118 S.Ct. 851, 139 L.Ed.2d 752 (1998); Olson v. General Elec. Astrospace, 101 F.3d 947 (3d Cir.1996); Burch v. Coca-Cola Co., 119 F.3d 305 (5th Cir.1997), cert. denied, 522 U.S. 1084, 118 S.Ct. 871, 139 L.Ed.2d 768 (1998); DeLuca v. Winer Industries, Inc., 53 F.3d 793, 797 (7th Cir.1995); Snow v. Ridgeview Medical Center, 128 F.3d 1201, 1206 (8th Cir.1997); Willis v. Conopco, Inc., 108 F.3d 282 (11th Cir.1997).
[4] In Bullion, our supreme court affirmed a summary judgment for the employer because it determined that after the plaintiff presented a prima facie case under the ADA, the employer "established a legitimate, nondiscriminatory reason for the action [of terminating the plaintiff], and [the plaintiff] presented no substantial evidence to indicate that the reasons offered by [the employer] were a pretext." 657 So.2d at 837.
[5] Actually, the Court was discussing the definition of "handicap" within the context of the Rehabilitation Act of 1973, 29 U.S.C. § 701 et seq. However, cases construing one statute are instructive in construing the other. Wooten v. Farmland Foods, 58 F.3d 382, 385 n. 2 (8th Cir.1995); Sutton v. United Air Lines, Inc., 130 F.3d at 897 n. 2.

"`Congress intended that the relevant case-law developed under the Rehabilitation Act be generally applicable to the term "disability" as used in the ADA.'" Bolton v. Scrivner, Inc., 36 F.3d 939, 943 (10th Cir.1994), cert. denied, 513 U.S. 1152, 115 S.Ct. 1104, 130 L.Ed.2d 1071 (1995) (quoting 29 C.F.R. § 1630.2(g)).
[6] In 1997, the statute was amended (in what might be called the "Sexton Amendment") to add the following at the end:

"and may be provided to the person who has been denied a driver license based upon the reports."