919 So.2d 1186 (2005)
Nicole KING, administrator of the estate of Christopher King, deceased
v.
CORRECTIONAL MEDICAL SERVICES, INC., et al.
2030903.
Court of Civil Appeals of Alabama.
April 15, 2005.
Rehearing Denied July 15, 2005.
*1188 Johnny B. Davis, Ozark, for appellant.
Philip G. Piggott of Starnes & Atchison, LLP, Birmingham, for appellee Correctional Medical Services, Inc.
CRAWLEY, Presiding Judge.
On October 20, 2000, Christopher King, an inmate incarcerated at Kilby Correctional Facility, died at Baptist East Hospital as a result of an infection of the brain. *1189 King had been transferred to the hospital on October 19, 2000, after becoming nonresponsive in the Kilby infirmary. In October 2002, King's sister, Nicole King, sued the Alabama Department of Corrections ("ADOC"); Mike Haley, who at that time was the commissioner of ADOC, in his individual capacity; and Correctional Medical Services, Inc. ("CMS"), the medical provider that administered ADOC's inmate health program; she also named several fictitiously named parties in her complaint. Ms. King alleged that under both state law and 42 U.S.C. § 1983 the defendants had negligently treated King, resulting in his death; that they had been deliberately indifferent to King's serious medical needs, thereby violating his constitutional right to be free from cruel and unusual punishment under the Eighth and Fourteenth Amendments to the United States Constitution; and that the policies of the various institutions that King had been incarcerated in between May 2000 and October 2000 exhibited deliberate indifference to the constitutional rights of inmates, such as King, to be free from cruel and unusual punishment. The complaint sought compensatory and punitive damages and attorney fees; it sought no declaratory or injunctive relief.
CMS moved for a summary judgment, arguing that the CMS physicians who treated King, Dr. Benjamin Glover and Dr. Jean Darbouze, had at all times acted consistently with the applicable standard of care and, therefore, that they could not be liable for medical malpractice under the Alabama Medical Liability Act, Ala.Code 1975, § 6-5-480 et seq. CMS attached the affidavits of both Dr. Glover and Dr. Darbouze and King's medical records in support of the motion. CMS did not specifically raise any issue regarding Ms. King's deliberate-indifference claim under § 1983. ADOC and Haley (referred to collectively at times as "the correctional defendants") moved for a summary judgment as well, in which they argued that they were entitled to sovereign immunity pursuant to Art. I, § 14, Ala. Const.1901;[1] that Haley was entitled to State-agent immunity as originally described in Ex parte Cranman, 792 So.2d 392 (Ala.2000), and adopted by a majority of our supreme court in Ex parte Butts, 775 So.2d 173 (Ala.2000);[2] that the complaint failed "to state a claim upon which a 42 U.S.C. § 1983 action can be maintained"; and that Ms. King could not establish that Haley had been deliberately indifferent to King's serious medical needs.
*1190 In opposition to CMS's summary-judgment motion, Ms. King filed a response that included excerpts of the deposition testimony of her medical expert, Dr. Robert B. Greifinger, in which he opined that both Dr. Glover's and Dr. Darbouze's evaluation and treatment of King fell below the applicable standard of care. Ms. King also argued that she had stated a deliberate-indifference claim against CMS and that CMS's summary-judgment motion failed to shift to her the burden of producing substantial evidence concerning that claim. CMS then filed a motion challenging whether Dr. Greifinger was a "similarly situated health care provider" as required by Ala.Code 1975, § 6-5-548(b). The trial court held a transcribed hearing at which the majority of the arguments centered on whether Dr. Greifinger qualified as a "similarly situated health care provider."
The trial court entered a full summary judgment in favor of all defendants, specifically concluding that Dr. Greifinger was not qualified as a "similarly situated health care provider" under § 6-5-548(b) and that ADOC and Haley were entitled to § 14 immunity and State-agent immunity, respectively. Ms. King appealed to the Alabama Supreme Court, which transferred the appeal to this court, pursuant to Ala.Code 1975, § 12-2-7(6). On appeal, Ms. King argues that the trial court incorrectly concluded that the correctional defendants were entitled to immunity and that Dr. Greifinger was not a "similarly situated health care provider." We affirm.

The Claims Against the Correctional Defendants
Ms. King argues that the correctional defendants are not entitled to immunity under § 1983 for their actions. As noted above, in their summary-judgment motion the correctional defendants argued that Ms. King's complaint was barred by § 14 immunity and by State-agent immunity, that the complaint failed "to state a claim upon which a 42 U.S.C. § 1983 action can be maintained," and that Ms. King could not establish that Haley had been deliberately indifferent to King's medical needs. Ms. King does not argue on appeal that the correctional defendants were not entitled to immunity on any state-law claims raised in her complaint; accordingly, the summary judgment in favor of the correctional defendants on Ms. King's state-law claims on the basis of immunity *1191 is affirmed. Tucker v. Cullman-Jefferson Counties Gas Dist., 864 So.2d 317, 319 (Ala.2003) (stating that issues not raised and argued in brief are waived).
We review a summary judgment de novo; we apply the same standard as was applied in the trial court. A motion for a summary judgment is to be granted when no genuine issue of material fact exists and the moving party is entitled to a judgment as a matter of law. Rule 56(c)(3), Ala. R. Civ. P. A party moving for a summary judgment must make a prima facie showing "that there is no genuine issue as to any material fact and that [it] is entitled to a judgment as a matter of law." Rule 56(c)(3); see Lee v. City of Gadsden, 592 So.2d 1036, 1038 (Ala.1992). If the movant meets this burden, "the burden then shifts to the nonmovant to rebut the movant's prima facie showing by `substantial evidence.'" Lee, 592 So.2d at 1038 (footnote omitted). "[S]ubstantial evidence is evidence of such weight and quality that fair-minded persons in the exercise of impartial judgment can reasonably infer the existence of the fact sought to be proved." West v. Founders Life Assurance Co. of Florida, 547 So.2d 870, 871 (Ala.1989); see Ala.Code 1975, § 12-21-12(d).
Ms. King argues that the trial court's summary-judgment order, which relies solely on § 14 immunity and State-agent immunity, fails to consider federal law governing immunity under § 1983. We agree; the trial court failed to appreciate that § 14 immunity and State-agent immunity have no applicability to federal-law claims. However, the summary judgment in favor of the correctional defendants on Ms. King's § 1983 claims is still proper. First of all, "[t]he State of Alabama, its agencies, and its officials acting in their official capacities are not considered `persons' for purposes of an action for damages under 42 U.S.C. § 1983."[3]State Dep't of Pub. Safety v. Sexton, 748 So.2d 200, 216 (Ala.Civ.App.1998) (citing Hafer v. Melo, 502 U.S. 21, 27, 112 S.Ct. 358, 116 L.Ed.2d 301 (1991)). Thus, the summary judgment in favor of ADOC on Ms. King's § 1983 claim is affirmed.
Secondly, with regard to Haley, the correctional defendants argued in their summary-judgment motion that Ms. King could not establish that Haley had been deliberately indifferent to King's medical needs. Haley's affidavit states that he made no decisions regarding the proper medical treatment for inmates and that he did not "intercede, overrule, or influence any decisions made by medical personnel *1192 regarding medical treatment for inmates." In addition, as the correctional defendants point out, King was never denied medical care. King's medical records establish that King was seen in, and in fact was often admitted to, the infirmaries of the various institutions at which he was incarcerated. The gravamen of Ms. King's complaint is that King was negligently diagnosed and treated.
"[D]eliberate indifference to serious medical needs of prisoners constitutes the `unnecessary and wanton infliction of pain,'" and is a violation of the Eighth Amendment right to be free from cruel and unusual punishment. Estelle v. Gamble, 429 U.S. 97, 104, 97 S.Ct. 285, 50 L.Ed.2d 251 (1976). Deliberate indifference can be manifested by prison personnel intentionally denying or delaying access to medical care, by prison personnel interfering with prescribed treatment, or by prison doctors responding indifferently to a prisoner's medical needs. Estelle, 429 U.S. at 104-05, 97 S.Ct. 285. However,
"an inadvertent failure to provide adequate medical care cannot be said to constitute `an unnecessary and wanton infliction of pain' or to be `repugnant to the conscience of mankind.' Thus, a complaint that a physician has been negligent in diagnosing or treating a medical condition does not state a valid claim of medical mistreatment under the Eighth Amendment. Medical malpractice does not become a constitutional violation merely because the victim is a prisoner."
Id. at 105-06, 97 S.Ct. 285.
As the correctional defendants point out in their summary-judgment motion, the Supreme Court in Estelle considered that the inmate plaintiff had been seen by medical personnel numerous times and that he had received treatment. Id. at 107, 97 S.Ct. 285. The Court, after considering the inmate's claim that other testing or treatment that had been warranted by his condition was not performed or prescribed, determined that the possibility that other tests or treatment might have been advisable in a certain situation was "[a]t most. . . medical malpractice." Id. The court stated that "[a] medical decision not to order [certain treatment] does not represent cruel and unusual punishment." Id.
Like the inmate in Estelle, King had undisputedly received medical care for his complaints. Even assuming that the medical care provided to King had been negligently rendered, no constitutional claim arises from what is essentially a claim of medical malpractice against Dr. Glover and Dr. Darbouze. None of Ms. King's allegations rises to the level necessary to state a constitutional claim of deliberate indifference to King's serious medical needs. Therefore, the summary judgment in favor of Haley on Ms. King's § 1983 deliberate-indifference claim is affirmed.

The Claims against CMS
The only issue on appeal concerning the summary judgment in favor of CMS is whether the trial court abused its discretion in determining that Dr. Greifinger, the expert proffered by Ms. King, was not a "similarly situated health care provider" under § 6-5-548. Ms. King does not argue on appeal that the summary judgment in favor of CMS on her deliberate-indifference claim is in error; thus, the summary judgment in favor of CMS on Ms. King's deliberate-indifference claim under § 1983 is affirmed. See Tucker v. Cullman-Jefferson Counties Gas Dist., 864 So.2d at 319 (stating that issues not raised and argued in brief are waived). Ms. King argues that Dr. Greifinger does qualify as a "similarly situated health care provider," and, therefore, she argues, the trial court's summary judgment in favor of CMS on her medical-malpractice claim *1193 should be reversed. CMS, however, argues that Dr. Greifinger does not qualify as a "similarly situated health care provider," and, therefore, it contends, Ms. King failed to present substantial evidence creating a genuine issue of material fact concerning whether Dr. Glover and Dr. Darbouze breached the applicable standard of care, thus entitling it to a judgment as a matter of law.
Section 6-5-548 governs how to establish what standard of care applies in a medical-malpractice action. Pursuant to § 6-5-548(e), testimony concerning the standard of care and the breach of the standard of care in a medical-malpractice action may only be given by a health care provider who qualifies as a "similarly situated health care provider." Our supreme court has established a framework under § 6-5-548 for determining whether a proffered expert witness is a "similarly situated health care provider" and is therefore qualified to testify. See Medlin v. Crosby, 583 So.2d 1290 (Ala.1991). According to Medlin, a trial court must consider three questions when considering whether the proffered expert is "similarly situated" to the defendant. Medlin, 583 So.2d at 1293.
"(1) What is the standard of care alleged to have been breached? (2) Is the defendant `health care provider' a specialist in the discipline or school of practice of the standard of care that the court has previously determined is alleged to have been breached? (3) Does the proffered expert witness qualify as a `similarly situated health care provider' under the subsection determined in the second step to apply[?]"
Id.
Although neither party has specifically addressed the first question posed under the Medlin analysis, we conclude that the standard of care that has allegedly been breached is that of a doctor practicing internal medicine in diagnosing a patient with infections of the brain. Neither party has indicated that Dr. Glover and Dr. Darbouze are considered specialists, so we must consult § 6-5-548(b) and the cases construing that subsection to determine whether Dr. Greifinger is a "similarly situated health care provider." Section 6-5-548(b) reads:
"(b) Notwithstanding any provision of the Alabama Rules of Evidence to the contrary, if the health care provider whose beach of the standard of care is claimed to have created the cause of action is not certified by an appropriate American board as being a specialist, is not trained and experienced in a medical specialty, or does not hold himself or herself out as a specialist, a `similarly situated health care provider' is one who meets all of the following qualifications:
"(1) Is licensed by the appropriate regulatory board or agency of this or some other state.
"(2) Is trained and experienced in the same discipline or school of practice.
"(3) Has practiced in the same discipline or school of practice during the year preceding the date that the alleged breach of the standard of care occurred."
The parties in the present case have focused on § 6-5-548(b)(3)specifically, whether Dr. Greifinger practiced in the same discipline as Dr. Glover and Dr. Darbouze in the year preceding the alleged breach of the standard of care giving rise to Ms. King's claim. CMS points out that Dr. Greifinger has not practiced "hands-on" medicine since 1985; thus, it argues, he does not qualify as a "similarly situated health care provider." Ms. King argues, relying heavily on Dowdy v. Lewis, 612 So.2d 1149, 1151 (Ala.1992), that our supreme *1194 court has not so narrowly construed § 6-5-548(b)(3) as to require actual "hands-on" practice in the same discipline but, instead, has permitted those who are "`highly qualified expert[s] possessing post-graduate degrees'" in their field and those who "`made it their business to determine what was on the "cutting edge" of the profession by continual study of the modern trends'" in the particular discipline to testify as experts.
Dr. Greifinger testified by deposition, of which all but six pages appear in the record. His curriculum vitae is contained in the record as well. He testified that he has not practiced "hands-on" medicine since 1985. He was originally trained as a pediatrician. Much of Dr. Greifinger's practice, however, has included managing community and institutional health-care programs, including serving as deputy commissioner and chief medical officer of the New York State Department of Correctional Services between 1989 and 1995. Since his tenure with the New York State Department of Correctional Services, Dr. Greifinger has been a "consultant on the design, management, operations, quality improvement and utilization management for managed care organizations and correctional health care systems." He has also served as a federally appointed monitor for three jail systems.
Ms. King argues that the supreme court's opinion in Dowdy compels the conclusion that Dr. Greifinger, because of his experience and alleged expertise in matters involving correctional health systems, is a "similarly situated health care provider" and is therefore qualified to testify against Dr. Glover and Dr. Darbouze. In Dowdy, the plaintiff argued that two nurses should not have been allowed to testify as expert witnesses to establish the applicable standard of care because the nurses "had not performed acts related to the care of persons hospitalized" during the year preceding the alleged breach of the standard of care at issue. Dowdy, 612 So.2d at 1151. In her argument to the supreme court, the defendant in Dowdy asserted that her nurse witnesses
"had devoted their full efforts to the teaching of nursing, which, she contend[ed], establishe[d] their competence to testify because `each nurse witness. . . was a highly qualified expert possessing post-graduate degrees in nursing'; that `these witnesses made it their business to determine what was on the "cutting edge" of the profession by continual study of the modern trends in nursing'; and `[if] anything, the two witnesses. . . were more highly qualified and current in their perception of the existing standard of care than would be required by § 6-5-548(b).'"
Id. at 1151. The Dowdy court agreed. Id. The court pointed out that the nurses were both well-qualified nursing instructors with postgraduate degrees in nursing who had spent many years in the practice of nursing and who supervised the training of nurses. Id. at 1152; see also Health-Trust, Inc. v. Cantrell, 689 So.2d 822, 827 (Ala. 1997) (affirming a trial court's decision to permit a witness to testify about the standard of care applicable to operating-room technicians because of the witness's "training, experience, and practice" as a former operating-room technician, her ability to "testify with authority concerning standards and guidelines set by the [Association of Operating Room Nurses,]" her "knowledgeable familiarity with surgical procedure and hospital practice," and her role as a director of medical services at a major hospital in the year preceding the alleged breach of the standard of care).
Ms. King argues that Dr. Greifinger, who has been appointed as a federal monitor of jail health systems and who himself *1195 served as the chief medical officer of the New York correctional system, is similar to the nurse witnesses permitted to testify in Dowdy. She specifically refers to the fact that Dr. Greifinger is a Fellow in the Society of Correctional Physicians, that he has published numerous professional journal articles on correctional health care, and that he has testified as an expert live or by deposition more than 20 times in cases involving correctional health management and prisoner medical care. At first glance, the parallel drawn by Ms. King between Dr. Greifinger and the nurse witnesses in Dowdy (and the witness in Cantrell) might appear to compel reversal. However, for several reasons, Ms. King's argument, though certainly not meritless, fails to convince us that the trial court's exclusion of Dr. Greifinger's testimony should be reversed.
A trial court is vested with discretion to determine whether a witness is qualified to give an expert opinion; its exercise of that discretion will not be reversed unless it is clear that the trial court's decision amounts to an abuse of its discretion. Husby v. South Alabama Nursing Home, Inc., 712 So.2d 750, 753 (Ala.1998). In both Dowdy and Cantrell, our supreme court affirmed a trial court's decision to allow the proffered witnesses to testify as experts. The fact that the trial court's decision to allow the testimony of the proffered witnesses did not amount to an abuse of discretion does not necessarily mean that the opposite decisionthat is, one to exclude their testimonywould have resulted in a reversal. However, even if Dowdy and Cantrell could be construed to permit the testimony of all health-care professionals who, though not actively practicing in the same discipline as the defendant doctor in the year preceding the alleged breach of the applicable standard of care, are highly qualified as a result of advanced degrees or are well-versed in the "cutting edge" techniques of their discipline, there are other reasons that those cases do not compel reversal in the present case.
In making its decision to affirm the trial court's decision allowing the nurse witnesses to testify, the Dowdy court quoted from the definition of the "practice of professional nursing" contained in Ala.Code 1975, § 34-21-1(3)(a). Dowdy, 612 So.2d at 1151. The definition contained in that section includes in the description of the activities that make up the practice of nursing the following: "perform[ing] . . . any act . . . in the promotion and maintenance of health . . . based upon the nursing process which includes systematic data gathering, assessment, appropriate nursing judgment and evaluation of human responses to actual or potential health problems through such services as . . . health teaching. . . ." § 34-21-1(3)(a). Thus, the Dowdy court may well have considered that "health teaching" included the training of other nurses and thus concluded that the proffered witnesses had, in fact, been engaged in the practice of nursing in the year preceding the alleged breach.
Finally, as we noted above, six pages of Dr. Greifinger's deposition are not contained in the record on appeal. Those pages, we confirmed, are also missing from the record before the trial court. In contrast to the evidence concerning the nurse witnesses in Dowdy, none of the testimony in Dr. Greifinger's deposition indicates that he is, by virtue of his past experience with the New York State Department of Correctional Services or by virtue of his recent experience as a federally appointed monitor, highly qualified in the field of internal medicine or that he has "`made it [his] business to determine what was on the "cutting edge" of the profession by continual study of the modern trends'" in *1196 internal medicine or correctional medicine. Dowdy, 612 So.2d at 1151. Nor did Dr. Greifinger testify concerning any professional standards articulated by professional associations or accrediting commissions regarding the standard of care applicable to the practice of internal medicine in a correctional setting as the witness in Cantrell did. Cantrell, 689 So.2d at 827.
Dr. Greifinger testified that he had not practiced "hands-on" medicine since 1985. Although the answer to the question whether he actually treated any inmates during his tenure with the New York State Department of Correctional Services is on the first of the pages missing from his deposition, based on the fact that he had testified that he had not practiced "hands-on" medicine since 1985, the reasonable inference is that he did not treat inmates in his supervisory position. Much of Dr. Greifinger's correctional experience involved developing comprehensive programs to address inmate health concerns like the treatment of HIVand tuberculosis infected inmates.
Like the trial court, we certainly do not question Dr. Greifinger's status as an expert in the realm of developing, improving, administering, and managing correctional health-care systems. However, we are not convinced that the trial court's ultimate conclusionthat Dr. Greifinger, because of his lack of "hands-on" medical practice in the year preceding the alleged breach in this case, is not a "similarly situated health care provider" under § 6-5-548(b) and is therefore not qualified to testify about the standard of care in the present caseis an abuse of the trial court's discretion. Therefore, we affirm the trial court's summary judgment in favor of CMS on King's medical-malpractice claim.
AFFIRMED.
THOMPSON, J., concurs.
PITTMAN, J., concurs specially.
MURDOCK and BRYAN, JJ., concur in the result, without writing.
PITTMAN, Judge, concurring specially.
I concur in the main opinion. I write specially to add that the expert-testimony requirements that are applicable in state-law medical-malpractice actions do not apply in the context of federal civil-rights claims pursuant to 42 U.S.C. § 1983, such as the claim asserted by Ms. King against CMS. As the main opinion recognizes, the gravamen of a federal civil-rights claim in this context is not a mere negligent breach of the applicable standard of medical care (as it is in claims governed by the Alabama Medical Liability Act of 1987, Ala.Code 1975, § 6-5-540 et seq.); rather, it is the deliberate indifference of correctional officials and agents to a particular prisoner's medical care.
In Montanez v. QuestCare, Inc., 675 So.2d 466 (Ala.Civ.App.1996), we affirmed a summary judgment against prison medical-care providers on a prisoner's state-law medical-malpractice claim based upon the prisoner's failure to adduce expert evidence from similarly situated health-care providers of a breach of the applicable standard of medical care. However, that failure was not stated in Montanez as a basis for affirming the summary judgment as to the prisoner's other claim, which asserted a violation of his civil rights; the summary judgment as to that claim was instead based upon the prisoner's failure to present substantial evidence that the prison doctor had been deliberately indifferent to the prisoner's need for medical treatment. It would have been unnecessary to reach the question of deliberate indifference in Montanez if the similarly situated health-care provider requirements set forth in Ala.Code 1975, § 6-5-548, applied in the context of claims under 42 U.S.C. § 1983 asserting deliberate indifference to medical needs.
*1197 To the extent that Ms. King's brief on appeal can be read to have challenged the trial court's summary judgment in favor of CMS on her federal civil-rights claim, and not just on her state-law medical-malpractice claim, I note that the main opinion correctly references the general rule that our trial courts are vested with discretion in determining whether to accept a particular witness, such as Dr. Greifinger, as an expert. Under our rules of evidence, questions such as "whether a witness is qualified as an expert and whether, if so qualified, that witness may give expert opinion or testimony on the subject in question[] are left largely to the discretion of the trial judge." Rule 702, Ala. R. Evid., official commentary. In my view, the general rule of discretion, and not Ala. Code 1975, § 6-5-548, compels affirmance of the federal civil-rights claim against CMS.
NOTES
[1] Article I, § 14, Ala. Const.1901, provides that "the State of Alabama shall never be made a defendant in any court of law or equity."
[2] As our supreme court stated in Alabama Dep't of Corr. v. Thompson, 855 So.2d 1016, 1020 (Ala.2003):

"`Ex parte Cranman, 792 So.2d 392 (Ala. 2000), recounts the evolution of State-agent immunity. . .,' Ex parte Rizk, 791 So.2d [911,] 913 [(Ala.2000)], and restates the law on that topic:
"`We therefore restate the rule governing State-agent immunity:
"`A State agent shall be immune from civil liability in his or her personal capacity when the conduct made the basis of the claim against the agent is based upon the agent's
"`(1) formulating plans, policies, or designs; or
"`(2) exercising his or her judgment in the administration of a department or agency of government, including, but not limited to, examples such as:
"`(a) making administrative adjudications;
"`(b) allocating resources;
"`(c) negotiating contracts;
"(d) hiring, firing, transferring, assigning, or supervising personnel; or
"`(3) discharging duties imposed on a department or agency by statute, rule, or regulation insofar as the statute, rule, or regulation prescribes the manner for performing the duties and the State agent performs the duties in that manner; or
"`(4) exercising judgment in the enforcement of the criminal laws of the State, including, but not limited to, law-enforcement officers' arresting or attempting to arrest persons; or
"`(5) exercising judgment in the discharge of duties imposed by statute, rule, or regulation in releasing prisoners, counseling or releasing persons of unsound mind, or educating students.
"`Notwithstanding anything to the contrary in the foregoing statement of the rule, a State agent shall not be immune from civil liability in his or her personal capacity
"`(1) when the Constitution or laws of the United States, or the Constitution of this State, or laws, rules, or regulations of this State enacted or promulgated for the purpose of regulating the activities of a governmental agency require otherwise; or
"`(2) when the State agent acts willfully, maliciously, fraudulently, in bad faith, beyond his or her authority, or under a mistaken interpretation of the law.'
"Ex parte Cranman, 792 So.2d 392, 405 (Ala.2000) (emphasis in original). `This restatement was adopted by our decisions in Ex parte Rizk, [791 So.2d at 913], and Ex parte Butts, 775 So.2d 173 (Ala.2000).' Ex parte Blankenship, 806 So.2d 1186, 1189 (Ala.2000)."
[3] The correctional defendants did not mention the State and its agencies' inability to be sued for damages under § 1983 in their summary-judgment motion, nor have they mentioned that principle of law in their brief on appeal. However, because the summary-judgment motion did argue that the complaint failed "to state a claim upon which a 42 U.S.C. § 1983 action can be maintained," we have construed that argument as an argument that the State and its agencies are not amenable to a damages suit under § 1983, and, therefore, we affirm the summary judgment on that ground. Cf. Liberty Nat'l Life Ins. Co. v. University of Alabama Health Servs. Found., P.C., 881 So.2d 1013, 1020 (Ala.2003) (explaining that the rule that permits an appellate court to affirm a trial court on any ground, even one not argued to the trial court, fails in application where due-process considerations required notice at the trial level, as in a situation involving a summary-judgment movant's failure to assert before the trial court a particular argument, thus not triggering the responding party's burden to produce substantial evidence on that issue or to argue that issue).